38 Cal.Rptr.3d 787 (2006)
Kirk CRAWFORD, et al., Plaintiffs and Appellants,
v.
WEATHER SHIELD MFG., INC., Defendant and Appellant.
No. G032301.
Court of Appeal, Fourth District, Division Three.
January 31, 2006.
*789 Sedgwick, Detert, Moran, & Arnold, Christina J. Imre, Stephanie Rae Williams and Orly Degani, Los Angeles, for Defendant and Appellant Weather Shield Mfg., Inc.
Anderson & Kriger, Clayton Anderson, La Mesa, Philip Y. Kim, Rancho Santa *790 Margarita; and Richard H. Benes, San Diego, for Plaintiffs and Appellants Kirk Crawford, et al.
Kabteck & Garris, Brian S. Kabateck, Los Angeles, Alfredo Torrijos; Kabateck Brown Kellner, and Richard L. Kellner, Pasadena, for Plaintiffs and Appellants Parviz Alai, et al.

*788 OPINION
SILLS, P.J.

I. SUMMARY
This appeal by a window manufacturer in a construction defect case involves three major issues.

A. The New Trial Order
The first issue is whether the trial judge abused his discretion in granting a partial new trial motion so as to allow a previously and erroneously dismissed strict liability claim against a window manufacturer to go forward. Here are the skeletal facts: Prior to a jury trial against a window manufacturer by a group of homeowners, two Court of Appeal decisions had precluded strict products liability claims against manufacturers of component parts for mass-produced homes. (La Jolla Village Homeowners' Assn. v. Superior Court (1989) 212 Cal.App.3d 1131, 261 Cal.Rptr. 146; Casey v. Overhead Door Corp. (1999) 74 Cal.App.4th 112, 87 Cal.Rptr.2d 603.) The window manufacturer strenuously argued that no strict liability claim against it should go to the jury. The trial judge, following those two appellate decisions, agreed.
However, after the jury's verdict, the Supreme Court ruled that strict liability claims could indeed be asserted against manufacturers of component parts for mass-produced homes. (Jimenez v. Superior Court (2002) 29 Cal.4th 473, 127 Cal.Rptr.2d 614, 58 P.3d 450.) In the process the Supreme Court expressly overruled both La Jolla and Casey, on which the trial judge had relied. So the judge did the logical thing and granted a partial new trial as to just the homeowners' strict liability claim.
Under such circumstances we are tempted to say the only possible abuse of discretion would have been if the trial judge hadn't granted the new trial motion. Certainly under the "or even fairly debatable" standard for the grant of new trial motions articulated in Jiminez v. Sears, Roebuck & Co. (1971) 4 Cal.3d 379, 387, 93 Cal.Rptr. 769, 482 P.2d 681 ["So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside."] there would seem to be no doubt that the trial judge acted within his discretion.[1]

B. Adjudication of the Developer's Defense Costs
But not only was the window manufacturer sued by the disappointed homeowners, so was the developer. There was an agreement between the window manufacturer, as subcontractor, and the developer in which the window manufacturer promised the developer to "defend" actions brought against the developer "founded on . . . claims growing out of the execution" of the window manufacturer's work. (We quote the entirety of indemnity clause in the margin now,[2] and again later in part IV. of this opinion when we discuss the *791 language in greater detail.) Pursuant to this promise, the developer asked the window manufacturer (as well as a window framer) to defend it in the homeowners' suit. The window manufacturer (and window framer) refused, and the developer eventually settled the case. The developer sought the costs of defending the homeowners' suit from both the window manufacturer and window framer, and the trial judge declared that the window manufacturer and window framer each owed half of the costs incurred in the lawsuit which were properly attributable to the homeowners' claims for leaky and fogging windows. However, the jury also found that the window manufacturer was not negligent.
Thus the issue arises: Did the absence of the window manufacturer's negligence retroactively excuse any duty that the window manufacturer had to provide a defense to the homeowners' suit which was  there is no argument as to this  founded upon claims growing out of the execution of the window manufacturer's work? That's the big issue in this case, and it accounts for most of the length of this opinion. The issue is of importance because it relates to legal problems that commonly arise in the construction industry[3] in a context where the case law is, perhaps, not as clear as one might hope. (Indemnity is an inherently dull subject anyway, and reading even the most pellucid indemnity opinion generally takes much longer than reading an equivalent length opinion about, say, school prayer or whether a trial judge abused his or her discretion in issuing a spousal support order.[4])
This opinion will show that, at least as regards the language of the particular contract before us, the case law is consistent, and upholds the decision of the trial judge.
At least two decisions of the Court of Appeal, Continental Heller Corp. v. Amtech Mechanical Services, Inc. (1997) 53 Cal.App.4th 500, 61 Cal.Rptr.2d 668 and Centex Golden Construction Co. v. Dale Tile Co. (2000) 78 Cal.App.4th 992, 93 Cal.Rptr.2d 259, have clearly held that there is no per se rule precluding a subcontractor-indemnitor from paying for the defense costs of a general contractor-indemnitee related to claims growing out of the subcontractor-indemnitor's *792 work, even though the subcontractor-indemnitor is ultimately found not to be negligent.
However, a separate group of Court of Appeal decisions, Peter Culley & Associates v. Superior Court (1992) 10 Cal.App.4th 1484, 13 Cal.Rptr.2d 624; Regan Roofing Co. v. Superior Court (1994) 24 Cal.App.4th 425, 29 Cal.Rptr.2d 413; Heppler v. J.M. Peters Co. (1999) 73 Cal.App.4th 1265, 87 Cal.Rptr.2d 497; Mel Clayton Ford v. Ford Motor Co. (2002) 104 Cal.App.4th 46, 127 Cal.Rptr.2d 759; and, most recently, Baldwin Builders v. Coast Plastering Corp. (2005) 125 Cal.App.4th 1339, 24 Cal.Rptr.3d 9, have language in them which, out of context, can be taken as supporting such a per se rule.
In this case we will prove that the latter cases do not stand, and should not be read, for any such per se rule. Readers who are willing to take our word that no opinion thus far, properly read in context, stands for a per se rule that the absence of negligence retroactively excuses a defense obligation undertaken by a subcontractor can save themselves about 20 pages of detailed explanations of these cases set forth in part IV.C of this opinion (at pp. 815-832). Readers who are skeptical, as counsel for the window manufacturer certainly will be (they heavily rely on several of these cases) are invited to wade through these cases with us. At the very least they will be a little more knowledgeable of what those cases actually do, and don't, say. (There is also the problem that, generally speaking, indemnity cases are hard to read and easy to forget. We hope, therefore, that our detailed summaries of the cases will serve the dual purpose of mapping the exact contours of the case and also of furnishing readers with summaries of the development of the existing case law to which they may refer in other contexts. (See Cal. Rules of Court, rule 976(c)(4)).)
In any event, let us at the outset emphasize the narrowness of our decision. Under no circumstances should this opinion be read as even remotely imposing on subcontractors who make promises like the one at bar anything resembling the broad triggers of a duty to defend that are associated with insurers' duties to defend. The case law is clear that non-insurance indemnity contracts are construed against the indemnitee and courts must construe narrowly the promises of subcontractors who make them. (E.g., Goldman v. Ecco-Phoenix Elec. Corp. (1964) 62 Cal.2d 40, 49, 41 Cal.Rptr. 73, 396 P.2d 377.) No way, for example, should the language before us in this case be construed to obligate the subcontractor to defend all claims against a general contractor (or developer) in a construction defect case, or, more particularly, claims that cannot be said to reasonably "grow out" of the subcontractor's particular work. (See, e.g., St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co. (2002) 101 Cal.App.4th 1038, 1049-1054, 124 Cal.Rptr.2d 818 [subcontractor not obligated to provide a defense to a general contractor in a context where the suit against the general contractor was entirely unrelated to any work that the subcontractor was doing at the time].)
We only construe the subcontract before us, but as to this particular subcontract, even narrowly construed, it is clear that this subcontractor was indeed obligated to defend the particular claims for which this developer was sued in this particular case. It is as simple as this: A window manufacturer who promises to "defend" claims "growing out" of the window manufacturer's "work" must provide a defense to the developer when the developer is sued by homeowners based on claims for defective windows  even if the window manufacturer is ultimately shown not to have been *793 negligent. (In that process we will also show that the relevant statutes governing indemnity, particularly section 2778, subdivision (3), not only do not pose any obstacle to the enforcement of what the parties contracted for here (the statute clearly does not apply when a "contrary intention governs"), but in fact contemplate the very result we reach today  that there will be times, however narrowly defined, when an indemnitor must provide a defense to an indemnitee even if the indemnitor has yet to be adjudicated negligent.)
Moreover, we also stress that any question of conscionability is not before us. We deal in this case only with two relatively large construction firms who, as the court put it in Continental Heller Corp. v. Amtech Mechanical Services, Inc., supra, 53 Cal.App.4th 500, 507, 61 Cal.Rptr.2d 668, "could be expected to review, understand and bargain over their indemnity agreement." Thus, for example, this opinion should in no way be cited for the idea that a subcontract saddling a "`small-time subcontractor . . . with ruinous liability'" (to quote Heppler v. J.M. Peters Co. (1999) 73 Cal.App.4th 1265, 1280, 87 Cal.Rptr.2d 497, quoting Continental Heller, supra, 53 Cal.App.4th at p. 507, 61 Cal.Rptr.2d 668) would necessarily be enforceable as against an unconscionability (or any other conceivable) challenge based on the disparity in the parties' bargaining power. We only hold that the trial court here correctly interpreted and adjudicated this subcontract, which was made between parties of relatively equal sophistication and bargaining power.

C. Attorney Fees Awarded For Prosecuting the Cross-Complaint
The final issue involves the trial court's determination of who was the "prevailing party" as between the window manufacturer subcontractor who promised to indemnify and defend the developer, and the developer. While the trial judge declared that the developer could recover defense costs from the subcontractor, the developer failed to obtain any "indemnity" from the subcontractor. That is, because the jury found the subcontractor not negligent, the subcontractor did not owe the developer for any part of what the developer ultimately paid the homeowners in the settlement.
So the result was mixed. The developer prevailed on "defense," the window manufacturer prevailed on what we will call in this opinion, "classic indemnity," that is, "indemnity" thought of as just paying for a judgment or settlement incurred by the indemnitee, as distinct from defense costs. As we will explain in part V. of this opinion, in the case of such mixed results, under Civil Code section 1717[5] the determination is within the trial court's discretion, and under analogous case law, it is clear that the trial court did not abuse that discretion.

D. Summary of Summary
The net result is that we will affirm the trial court's grant of a partial new trial order, and we will affirm those parts of the judgment otherwise challenged by the appellant subcontractor.

II. FACTS AND PROCEDURAL HISTORY

A. The Underlying Construction Defect Case
A group of about 200 homeowners in the Huntington Place housing development in *794 Huntington Beach brought a construction defect action against the developer of the project,[6] as well as against the project's window manufacturer[7] and window framer.[8] The homeowners sued the window manufacturer on theories of strict products liability, negligence, and breach of warranty. They asserted that the window manufacturer's wooden windows were defectively designed and manufactured, causing them to leak and fog. The developer filed a cross-complaint against the window manufacturer and the window framer, seeking its attorney fees incurred in defending against the homeowners' suit, as well as indemnification (indemnification meaning money paid to satisfy a judgment or settlement of that suit).[9] The homeowners eventually entered into a sliding scale "Mary Carter" agreement with the developer, in conjunction with which all complaints and cross-complaints were dismissed except as to the window manufacturer and the window framer, who did not settle.

B. The Striking of the Claims for Strict Products Liability
In the summer of 2002, before trial, the window manufacturer filed a special trial brief requesting that the homeowners' strict liability claim against it be stricken. Noting that the only appellate decisions still on the books at the time (La Jolla and Casey) were clear that strict liability could not be asserted against subcontractors in a mass-produced housing project, the trial brief asserted that it "would be error for the court to give jury instructions regarding strict products liability." Accordingly, in late July of 2002, the trial judge dismissed the homeowners' strict liability claims, characterizing his action as granting a motion for "judgment on the pleadings."

C. The Jury's Decision on the Negligence and Warranty Claims
The homeowners' negligence and breach of warranty causes of action were, however, allowed to go to the jury. Additionally, the developer's claim for contractual indemnification went to the jury, but not its claim for attorney fees for defending the general contractor in the suit brought against it by the homeowners, and in fact the jury was specifically instructed "not to concern" itself with "any claim for attorney's fees."[10]
The jury found in favor of the window manufacturer on both the homeowners' claims for negligence and breach of warranty, and on the developer's claim for contractual indemnity.
*795 The window framer, however, did not do so well. When one counts up the various homeowner-by-homeowner components of the judgment, it turns out that the jury awarded more than $700,000 against it. The window framer then settled with the plaintiffs.

D. The Trial Court's Decision on the Developer's Claim for Defense Fees
But in the later bench trial on the developer's attorney fee claim, the window manufacturer incurred a loss. The trial judge determined that the window subcontractor's promise to defend lawsuits "founded on" claims of damage growing out of the execution of the window manufacturer's work meant that the window manufacturer was responsible for the developer's attorney fees attributable to the window problems experienced by the homeowners.
Of course, the window framer was responsible for those problems too, so there was a need for allocation. The developer's risk manager had allocated 70 percent of the developer's settlement payment to window problems. Accordingly, the trial judge allocated 70 percent of the developer's total defense costs of $375,069 to window problems. That 70 percent amounted to $262,548. The trial court then split the amount equally between the window manufacturer and the window framer, and came up with a figure of $131,274. That amount, the judge declared, was what the window manufacturer owed the developer.

E. The Judgment
The result of all of these proceedings was a judgment, filed March 14, 2003, embodying zero liability on the part of the window manufacturer to the homeowners, zero liability on the part of the window manufacturer to the developer for the developer's causes of action for "breach of contract and express indemnity," but providing, by way of declaratory relief, a determination that the developer was "entitled to be indemnified" by the window manufacturer in the "principal amount of $131,274."

F. The New Trial Order
In the interval between the jury's decisions and the judge's determination on the defense issue in the bench trial, our Supreme Court handed down Jimenez v. Superior Court, supra, 29 Cal.4th 473, 127 Cal.Rptr.2d 614, 58 P.3d 450. Jimenez held that "the manufacturers of component parts, here windows, that are installed in mass-produced homes can be subject to strict products liability in tort when their defective products cause harm." (Id. at p. 481, 127 Cal.Rptr.2d 614, 58 P.3d 450, italics added.)
The homeowners brought a new trial motion in early April based on, among other things, the newly-minted Jimenez decision. The trial judge granted the motion with respect to the strict product liability cause of action. He noted that the homeowners had the right to instructions on their theory of the case if the instruction was reasonable and found support in the pleadings and evidence. (See 7 Witkin, Cal. Proc. (4th ed. 1997) Trial, § 270, p. 317.) The trial judge also analyzed whether the error precipitating the ground for the new trial was prejudicial under factors set forth in Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 580-581, 34 Cal.Rptr.2d 607, 882 P.2d 298.[11] In considering the Soule factors, the trial judge *796 concluded that the failure to instruct the jury on strict liability was indeed prejudicial. Substantial evidence of defects had indeed been shown  "volumes" of it, as he phrased it. Moreover, the theory of strict liability implicated only the window manufacturer. And while one could say the same thing about the theory of warranty which the jury had considered, the warranty theory, as the trial judge noted, had the "problematic overlay of the requirement of timely notice" which was "particularly difficult since the vast majority of plaintiffs did not even know who manufactured their windows." Strict liability, by contrast, was "simpler." Only a defect causing damage needed to be shown.
Moreover, strict liability was a theory "for which blame could not be shifted." By this statement, the trial court was clearly alluding to the possibility that the jury shifted the entire blame for all the window problems in the tract onto the window framer because of the absence of instructions on strict product liability which turned the jury's focus away from the window manufacturer and onto the window framer.

G. Miscellaneous Matters and Appeals
The trial court also struck a number of items from the window manufacturer's cost bill, and awarded about $47,000 in attorney fees to the developer for having been the prevailing party on its cross-complaint.
Timely appeals were filed by the window manufacturer from both the trial court's judgment on the developer's declaratory relief cause of action in the March judgment, from its May new trial order, from the order striking portions of its cost bill[12] and from the attorney fee award to the developer as prevailing party on its cross-complaint. The homeowners also filed protective cross-appeals, which we are dismissing as moot in the light of our disposition on the merits of the new trial order.[13]

III. THE NEW TRIAL ORDER

A. Prejudicial Error
As noted in part I of this opinion, new trial orders are evaluated on an abuse of discretion basis. (See Jiminez v. Sears, Roebuck & Co., supra, 4 Cal.3d 379, 387, 93 Cal.Rptr. 769, 482 P.2d 681 ["The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. . . . So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside."]; see also Sandco American, Inc. v. Notrica (1990) 216 Cal.App.3d 1495, 1506, 265 Cal.Rptr. 587.) As this court wrote in Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs (1998) 67 Cal.App.4th 743, 751, 79 Cal.Rptr.2d 248, "given the latitude afforded a judge in new trial motions, orders granting new trials are `infrequently reversed.'" (Quoting Mercer v. Perez (1968) 68 Cal.2d 104, 113, 65 Cal.Rptr. 315, 436 P.2d 315.)
As indicated above, this standard of review is quite lenient in the context of *797 grant of new trials. Apparently realizing this lenient standard, the window manufacturer tries to shift the issue to something that feels more like a straight binary question of law: Was there any prejudicial error justifying the new trial decision? (See Garcia v. County of Los Angeles (1986) 177 Cal.App.3d 633, 641, 223 Cal.Rptr. 100 ["`The grant of a new trial for harmless error violates the constitutional provision and wastes judicial time and resources to no purpose.'"]; Osborne v. Cal-Am Financial Corp. (1978) 80 Cal.App.3d 259, 266, 145 Cal.Rptr. 584 [source of quote above].)
The window manufacturer answers no to its own question. It basically argues that because the homeowners put on all their defect evidence in their negligence case, the jury, in substance and effect, considered strict products liability and found no defects. Specifically, the window manufacturer argues that in order to determine that the window manufacturer was not negligent, the jury necessarily had to determine that the windows were not defective, either in design or manufacture.
Not so. Of course, there can be significant overlap between strict products liability and negligence. As the court in Milwaukee Electric Tool Corp. v. Superior Court (1993) 15 Cal.App.4th 547, 559, 19 Cal.Rptr.2d 24, put it, there is a "functional similarity between negligence theory and strict products liability insofar as duty and breach is concerned." (See also Merrill v. Navegar (2001) 26 Cal.4th 465, 480, 110 Cal.Rptr.2d 370, 28 P.3d 116 ["over the years, we have incorporated a number of negligence principles into the strict liability doctrine"].)
However, there are still significant differences in the two causes of action, particularly in elements, focus and proof. These differences show that a strict products liability instruction in this case might indeed have led to a different result.
First, there is the matter that the jury considers the "additional" element in negligence  more specifically, the reasonableness of the defendant's conduct. (See Merrill, supra, 26 Cal.4th at p. 479, 110 Cal.Rptr.2d 370, 28 P.3d 116 ["Under a negligence theory, a plaintiff must also prove `an additional element, namely, that the defect in the product was due to negligence of the defendant.'"].)
In this regard, Fluor Corp. v. Jeppesen & Co. (1985) 170 Cal.App.3d 468, 216 Cal.Rptr. 68 is particularly instructive because, like the present case, it involved a strict liability instruction that was refused and an appellant's later claim that a jury finding of no negligence on the defendant's part precluded recovery under strict liability principles. (See id. at p. 479, 216 Cal.Rptr. 68.) A corporate jet had crashed when it struck the side of a nearby hill while approaching an airport on a snowy night. The owner of the jet sued the maker of an instrument approach chart, claiming the chart was defective for not having shown the hill. (Id. at p. 473, 216 Cal.Rptr. 68.) The trial judge erroneously concluded that the principle of strict products liability did not apply to the case because he thought the principle only applied to items whose physical properties rendered those items innately dangerous  not a mere chart. (Id. at p. 475, 216 Cal.Rptr. 68.) He therefore refused to give the jury a strict products liability instruction. He did, however, give the jury a negligence instruction. The result was defense judgment, and even a special jury finding that the chart maker was not negligent. (See id. at pp. 475, 479, fn. 3, 216 Cal.Rptr. 68.)
The appellate court, however, reversed, finding that the failure to instruct on strict liability was both error and prejudicial. *798 (Fluor, supra, 170 Cal.App.3d at pp. 479-480, 216 Cal.Rptr. 68.) The court had an easy time concluding that the failure to instruct on strict liability was error. If any product should be subject to strict products liability, surely it was an aircraft chart prepared to help pilots avoid hills and mountains. (Id. at pp. 474-478, 216 Cal.Rptr. 68.)
The chart maker argued, though, that the failure to instruct on strict liability was harmless error. And its theory was the same one offered to us now: namely, that the substance of strict liability had already been given to the jury, either by way of instructions on warranty or on negligence. (See Fluor, supra, 170 Cal.App.3d at pp. 478-480, 216 Cal.Rptr. 68.)
Indeed, as to the warranty instructions, the chart maker's argument was eerily close to the one the window manufacturer makes before us now, i.e., that the jury had found on the instructions it had that the chart would perform up to consumer expectations, i.e., the jury found no defect.[14] But the appellate court rejected the argument. While the strict liability standard had been said to be "somewhat analogous" to the warranty standard (see Fluor, supra, 170 Cal.App.3d at p. 478, 216 Cal.Rptr. 68, italics omitted), there was still a difference: Strict liability involves reasonably foreseeable use as distinct from merely intended use. (Id. at p. 479, 216 Cal.Rptr. 68.)
Also, like the present case, the chart maker tried to take advantage of the jury's no-negligence finding. The chart maker asserted the jury's finding rendered the failure to instruct on strict products liability superfluous. But that argument was rejected as well. The Fluor court refuted it by quoting a long passage from the venerable Barker v. Lull Engineering Co. (1978) 20 Cal.3d 413, 434, 143 Cal.Rptr. 225, 573 P.2d 443, and we will now follow the Fluor court's lead: "[I]n a strict liability case, as contrasted with a negligent design action, the jury's focus is properly directed to the condition of the product itself, and not to the reasonableness of the manufacturer's conduct. [Citations.] [¶] Thus, the fact that the manufacturer took reasonable precautions in an attempt to design a safe product or otherwise acted as a reasonably prudent manufacturer would have under the circumstances, while perhaps absolving the manufacturer of liability under a negligence theory, will not preclude the imposition of liability under strict liability principles if, upon hindsight, the trier of fact concludes that the product's design is unsafe to consumers, users, or bystanders." (Id. at p. 434, 143 Cal.Rptr. 225, 573 P.2d 443, italics added.) The effect of this quotation is that a manufacturer can indeed not breach a duty of care as far as negligence is concerned  the manufacturer may, after all, have acted reasonably under the circumstances  but still be held liable under strict liability principles if its product design is unsafe.
The passage from Barker also notes the difference in the jury's focus in strict liability as distinct from its focus in negligence. In the former, the emphasis is on the product. In the latter, the emphasis is *799 on the reasonability of the manufacturer's conduct. (See Barker, supra, 20 Cal.3d at p. 434, 143 Cal.Rptr. 225, 573 P.2d 443 ["in a strict liability case, as contrasted with a negligent design action, the jury's focus is properly directed to the condition of the product itself, and not to the reasonableness of the manufacturer's conduct"]; see also Brown v. Superior Court (1988) 44 Cal.3d 1049, 1056, 245 Cal.Rptr. 412, 751 P.2d 470 [strict liability "focusses not on the conduct of the manufacturer but on the product itself, and holds the manufacturer liable if the product was defective"].)
This difference between reasonability and defect qua defect is particularly important in evaluating the reasonableness of a new trial order, because in considering whether to grant a new trial motion, a trial judge has the authority to weigh the evidence and even draw inferences contrary to the jury's. (See Widener v. Pacific Gas & Electric Co. (1977) 75 Cal.App.3d 415, 440, 142 Cal.Rptr. 304.)[15] As the trial judge in this case noted, strict liability would have focused the jury's attention on the nature of the manufactured windows themselves, in a context where blame could not be shifted. Thus, the jury might very well have been inclined to assign all liability to the window framer and exonerate the window manufacturer without ever considering whether the windows were still defective despite the manufacturer's reasonableness.[16]
Finally, the difference in proof is important too. One of the very purposes behind strict products liability is "to provide a `short cut' to liability where negligence may be present but is difficult to prove." (Pierce v. Pacific Gas & Electric Co. (1985) 166 Cal.App.3d 68, 83, 212 Cal.Rptr. 283.) Thus, as the court noted in Pierce, proof may require presentation of evidence bearing on the manufacturer's "inner workings," which can involve a great deal of complex, technical detail. (Ibid.) Strict products liability alleviates that burden of probing the "inner workings" of the defendant manufacturer. Thus, for example, while a plaintiff trying to show negligence might have to wade through boxes of corporate minutae to show unreasonableness, a plaintiff trying to show that a product is defective can focus on the product itself.
In light of the foregoing differences between strict products liability and negligence, we cannot say that the trial court abused its discretion in determining that the absence of a strict products liability instruction was indeed prejudicial.

B. Applicability of Jimenez

The window manufacturer argues that it was basically unfair to give *800 retroactive application to the Supreme Court's decision in Jimenez, supra, 29 Cal.4th 473, 127 Cal.Rptr.2d 614, 58 P.3d 450. (See Douglas v. Ostermeier (1991) 1 Cal.App.4th 729, 740, 2 Cal.Rptr.2d 594 [courts will not apply new decisions retroactively when "considerations of fairness, foreseeability and public policy preclude full retroactivity"].) Of course, the general rule is retroactivity, even when decisions have declared new causes of action. (See Newman v. Emerson Radio Corp. (1989) 48 Cal.3d 973, 981-982, 258 Cal.Rptr. 592, 772 P.2d 1059 ["With few exceptions and even after expressly considering suggestions to the contrary, California courts have consistently applied tort decisions retroactively even when those decisions declared new causes of action or expanded the scope of existing torts in ways defendants could not have anticipated prior to our decision."].)
Here, considerations of fairness do not militate against retroactivity at all. First, as the Jimenez court itself indicated, appellate courts had disagreed on the "soundness" of the component manufacturer-subcontractor exception to strict products liability by 1991, which was only two years after the exception was first announced in La Jolla. (See Jimenez, supra, 29 Cal.4th at p. 478, 127 Cal.Rptr.2d 614, 58 P.3d 450, citing Monte Vista Development Corp. v. Superior Court (1991) 226 Cal.App.3d 1681, 1686, 277 Cal.Rptr. 608.) By contrast, the original rationale for extending strict products liability to mass produced homes had been well established for two decades, since 1969 in Kriegler v. Eichler Homes, Inc. (1969) 269 Cal.App.2d 224, 227, 74 Cal.Rptr. 749. Moreover, as the Jimenez court noted, there are "`no meaningful distinctions' between, on the one hand, component manufacturers and suppliers and, on the other hand, manufacturers and distributors of complete products; for both groups, the `overriding policy considerations are the same.'" (Jimenez, supra, 29 Cal.4th at pp. 479-480, 127 Cal.Rptr.2d 614, 58 P.3d 450, quoting Kriegler, supra, 269 Cal.App.2d at p. 227, 74 Cal.Rptr. 749.) Thus the ultimate Jimenez rule was reasonably foreseeable.
On top of that, at the time that the window manufacturer here made its motion to, in effect, dismiss the homeowners' strict liability cause of action, the Supreme Court had already granted review in Jimenez, and had granted it in a case that came from the same division of the Court of Appeal that had earlier decided La Jolla, and which had disagreed with La Jolla. (See Jimenez, supra, 29 Cal.4th at p. 479, 127 Cal.Rptr.2d 614, 58 P.3d 450.) Thus, as the homeowners and developer aptly note, the window manufacturer took a calculated risk of retrial in the event that its position was ultimately rejected by the high court in Jimenez. Under such circumstances it hardly seems unfair to give the decision the usual retroactivity. Not to give Jimenez retroactive effect would reward the window manufacturer with the best of both worlds for its gamble.

C. The Statute of Limitations
A variation on the window manufacturer's prejudicial error theme is the idea that the window manufacturer is bound to prevail on a strict products liability claim anyway because the claim is barred by the statute of limitations. The statute of limitations on which it relies, section 338, subdivision (b) of the Code of Civil Procedure, is a three-year statute governing all claims for "injury to real property," whether based upon negligence (Angeles Chemical Co. v. Spencer & Jones (1996) 44 Cal.App.4th 112, 119, 51 Cal.Rptr.2d 594) or strict products liability (Mills v. Forestex Co. (2003) 108 Cal.App.4th 625, 647, 134 Cal.Rptr.2d 273). *801 The houses were all completed between 1989-1991, but the plaintiffs' lawsuits were filed in 1999.
However, it is established that the statute is subject to what is commonly called the "discovery rule." (Angeles Chemical Co. v. Spencer & Jones, supra, 44 Cal.App.4th at pp. 119-120, 51 Cal.Rptr.2d 594.) Under the discovery rule, the statute commences to run only when the plaintiff knows, or should have known, of the damage and its cause. (See id. at p. 119, 51 Cal.Rptr.2d 594; Regents of University of California v. Hartford Acc. & Indem. Co. (1978) 21 Cal.3d 624, 630, 147 Cal.Rptr. 486, 581 P.2d 197; Leaf v. City of San Mateo (1980) 104 Cal.App.3d 398, 406-408, 163 Cal.Rptr. 711; 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 464, 584-587.)
And in regard to the discovery rule, the trial judge could reasonably conclude that the homeowners did not know or have a reasonable basis to know that their windows were defective prior to three years of filing their lawsuits. After all, the jury found the window framer liable in negligence, and the window framer was subject to the same three-year statute of limitations. From that, the trial judge could readily conclude that whatever reason the jury had for not finding the window manufacturer liable in negligence, it wasn't because the homeowners had waited too long to file their claims.

IV. THE ADJUDICATION OF THE DEVELOPER'S DEFENSE COSTS

A. The Issue of the Duty to Defend As Distinct From the Duty to Indemnify
The window manufacturer's argument basically posits a hard and fast common law rule against requiring an indemnitor-subcontractor from ever being required to pick up the tab for an indemnitee-general contractor's defense costs without an ultimate finding of negligence. Thus, asserts the window manufacturer, having been adjudged not negligent by the jury, it never had a duty to defend claims against the developer based on window defects, and the trial judge was in error to so declare.
As we shall now show, the trial judge's declaration was not error. And the best place to demonstrate that the ruling was not error is with the subcontract itself and the relations it created between the parties, considered apart from any template otherwise imposed by case law. (See Rossmoor Sanitation, Inc. v. Pylon, Inc. (1975) 13 Cal.3d 622, 633, 119 Cal.Rptr. 449, 532 P.2d 97.) After we ascertain what the text of the subcontract provided, we will confront that case law.[17]

*802 B. The Subcontract Itself

1. General Preliminary Considerations

Normally, developers and general contractors protect themselves against construction defect lawsuits in two independent ways. First, they insist that their subcontractors have a commercial general liability (CGL) insurance policy and they be named as additional insureds on that policy. The subcontract in this case, for example, operates in such a manner. Thus the developer obtains a direct relationship with the subcontractor's insurer.[18]
Second, developers and general contractors often insist on a separate contract, in which the subcontractor itself agrees to indemnify and, often, also to specifically "defend" claims brought against the developer or subcontractor founded upon the subcontractor's work. This separate contract creates a direct relationship between the developer and the subcontractor.[19]
*803 Most published litigation involving indemnity claims has involved the first kind of relationship, between the developer (or general contractor) and the subcontractor's insurer. The case before us, by contrast, only concerns the second relationship, running from the subcontractor itself directly to the developer. At least on its face it only implicates the developer-subcontractor relationship.[20]

2. The Text of the Subcontract

While there has been a considerable overlay of case law on the interpretation of indemnity contracts, it is the intention of the parties as actually expressed in the indemnity agreement itself that should control. (Rossmoor Sanitation, Inc. v. Pylon, Inc., supra, 13 Cal.3d 622, 633, 119 Cal.Rptr. 449, 532 P.2d 97 [the "question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control"].)[21] Accordingly, we will *804 set forth the agreement between the window manufacturer and the developer here. In section 12 of the contract, under the all caps heading "Indemnity and Insurance," the contract provides (and we quote all of section 12):
"Contractor does agree to indemnify and save Owner harmless against all claims for damages to persons or to property and claims for loss, damage and/or theft of homeowner's personal property growing out of the execution of the work, and at his own expense to defend any suit or action brought against Owner founded upon the claim of such damage or loss or theft; to procure and maintain, during the entire progress of the work, full and unlimited Workman's Compensation and Employers' Liability Insurance, Public Liability and Property Damage Insurance including without limitation automobile and products liability covering in amounts and with a carrier or carriers satisfactory to Owner; to furnish Owner with certificates of said insurance before commencing work hereunder which certificates shall provide that the policy shall not be canceled or reduced in coverage until ten (10) days after written notice shall be given to Owner of such cancellation or reduction in coverage; to insure his interest from loss to the premises resulting from fire, earth settlement, earthquake, theft, embezzlement, riot or any other cause whatsoever and Owner shall not, under any circumstances, be liable or accountable to the Contractor for such loss."

3. Analysis of the Subcontract

a. Construction Against Indemnitee (the Developer)
We begin first by noting one obvious difference between an insurance contract and a subcontract between a developer and a subcontractor: While both the insurer and the subcontractor may, under their respective agreements, assume the role of indemnitor, the usual set of construction presumptions run in opposite directions. (Goldman v. Ecco-Phoenix Elec. Corp., supra, 62 Cal.2d 40, 49, 41 Cal.Rptr. 73, 396 P.2d 377.) Everybody knows that insuring clauses in insurance contracts are broadly construed in favor of coverage, with exclusions narrowly construed, again so that coverage is as broad as possible consistent with the unambiguous language of the policy. (E.g., State Farm Mut. *805 Auto. Ins. Co. v. Partridge (1973) 10 Cal.3d 94, 101-102, 109 Cal.Rptr. 811, 514 P.2d 123 ["Whereas coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured . . ., exclusionary clauses are interpreted narrowly against the insurer."].) Insurance contracts are classic contracts of adhesion and insurers have the stronger bargaining power.
On the other hand, subcontractors are typically in a take-it-or-leave-it situation vis-à-vis general contractors and developers. Thus, as our high court said in Goldman, supra, 62 Cal.2d at page 49, 41 Cal.Rptr. 73, 396 P.2d 377: "It is true that the indemnification contract resembles the insurance contract and that we would interpret the insurance policy against the draftsman, but a major reason for so reading such a policy emanates from its role as an adhesion contract, particularly from the status of the insurance company as the dominant bargainer in dealing with the public. These characteristics do not appear here; the situation is in fact reversed: the general contractor takes bids from competing subcontractors, and, if anything, the general contractor occupies the better bargaining position."
Goldman has thus come to stand for the proposition that (non-insurance) indemnity agreements are strictly construed against the indemnitee. (E.g., Heppler, supra, 73 Cal.App.4th at p. 1277, fn. 8, 87 Cal.Rptr.2d 497.) Following Goldman, we are mindful that this subcontract must be construed narrowly, and in particular that the scope of the duty to defend undertaken by the subcontractor will be the narrowest possible consistent with the contract language.

b. The Nature of Indemnifying and Defending
But even with a rule of strict construction against the developer here, that does not mean this court can ignore the terms of the contract. Readers of the contract language just quoted will notice that the contract uses two different verbs in its first sentence: "Contractor does agree to indemnify and save Owner harmless against all claims for damages . . . growing out of the execution of the work, and at his own expense to defend any suit or action brought against Owner founded upon the claim of such damage or loss or theft. . . ." (Italics added.) An elementary rule of contract construction is the rule against surplusage, i.e., the use of different words is presumed to mean different things. (E.g., Shell Oil Co. v. Winterthur Swiss Ins. Co. (1993) 12 Cal.App.4th 715, 753, 15 Cal.Rptr.2d 815 ["The way we define words should not produce redundancy. . . ."].) The natural presumption is, then, that in using the verbs "indemnify" and "defend," the subcontract contemplated two different actions from the promisor subcontractor.
Express contractual indemnity is defined in the Civil Code. Section 2772 provides: "Indemnity is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." Case law, which has involved claims of indemnity based on implied as well as expressly contractual relationships, has defined indemnity as "the obligation resting on one party to make good a loss or damage another has incurred." (See Rossmoor Sanitation, Inc. v. Pylon, Inc., supra, 13 Cal.3d 622, 628, 119 Cal.Rptr. 449, 532 P.2d 97; see also E.L. White, Inc. v. City of Huntington Beach (1978) 21 Cal.3d 497, 506, 146 Cal.Rptr. 614, 579 P.2d 505 [repeating definition].) We know from these definitions that "indemnity" surely includes at least the paying of a judgment or settlement that might result from certain conduct.
*806 But an obligation to "defend," on the other hand, is more specific. Buss v. Superior Court (1997) 16 Cal.4th 35, 46, 65 Cal.Rptr.2d 366, 939 P.2d 766 provides this definition: Defense is "the rendering of a service, viz., the mounting and funding of a defense [citations] in order to avoid or at least minimize liability."
Several points must be noted about the Buss definition. First, to be true, Buss was talking about an insurer's defense obligation. The Buss court was not specifically addressing the duty to defend contractually undertaken by a subcontractor. That said, there is no reason why the word "defend" should mean something else when it is used by a subcontractor than when it is used by an insurer. The idea of providing a defense to minimize another's liability, which is an essential ingredient of the Buss definition, applies just as much in the subcontractor-indemnitor context as it does in the insurer-indemnitor context. Subcontractor-indemnitors, insurers, indemnitees and insureds all have an interest in minimizing any judgment for which their indemnitees (or insureds) might be liable.
The idea that the word "defend" has some special or "term of art" meaning in the construction industry that does not entail the actual provision of legal services to deal with a pending lawsuit is untenable. No evidence of any such special meaning was offered in the case before us, and the case law is full of examples where the beneficiaries of defense obligations in construction cases acted like one would expect if the word were given its usual and ordinary meaning of providing legal services to defend a pending lawsuit. (E.g., Baldwin Builders v. Coast Plastering Corp., supra, 125 Cal.App.4th 1339, 1342, 24 Cal.Rptr.3d 9 [developer requested subcontractors to defend it against homeowners' claims right after homeowners filed suit]; Royal Surplus Lines Ins. Co. v. Ranger Ins. Co. (2002) 100 Cal.App.4th 193, 197, 122 Cal.Rptr.2d 459 [during "pendency" of underlying action where owner of apartment complex was sued by tenants for injuries sustained during construction, owner tendered defense of action to various subcontractors as well as subcontractors' insurers]; Heppler v. J.M. Peters Co., supra, 73 Cal.App.4th at p. 1265, 87 Cal.Rptr.2d 497 [developer tendered defense of underlying complaints to subcontractors and received rejections]; Regan Roofing Co. v. Superior Court, supra, 24 Cal.App.4th at p. 430, 29 Cal.Rptr.2d 413 [developer tendered defense of underlying lawsuit]; Aero-Crete, Inc. v. Superior Court (1993) 21 Cal.App.4th 203, 206, 25 Cal.Rptr.2d 804 [on the filing of construction defect lawsuit, developer tendered defense to various subcontractors as well as its insurers].)
Second, readers should notice all those gerunds in the definition given by our high court in Buss  mounting, rendering, funding. A defense obligation is of necessity a current obligation. The idea is to mount it, render it, and fund it now, before the insured's  or indemnitee's  default is taken, or trial preparation is compromised. Thus, as Buss noted, the duty to defend arises as soon as the request for it is made, and is discharged when the action is concluded (or earlier, if it is shown that the duty to defend no longer exists). (See Buss, supra, 16 Cal.4th at p. 46, 65 Cal.Rptr.2d 366, 939 P.2d 766.)
Third, what is the alternative? Suppose we were to try to fashion a definition of "defend" as used in a subcontract that was different from the definition set forth in Buss? What would it be? The only possible alternative  other than just ignoring the term and, in effect, reading the word "defend" out of the contract  would be to write the word "defend" out of the contract and substitute "reimburse attorney fees if and only after negligence has been established." And in fact that redefinition *807 is the operative definition that the window manufacturer urges upon us now.
But this equation of defense with reimbursement is arbitrary and at direct odds with the plain meaning of the word "defend." The ordinary meaning of the word "defend" accords with the Buss definition.
Defense is the rendering of a service at the time  the emphasis is on the present tense: Soldiers defend their country, attorneys defend their clients, chess players defend the King against capture, football players defend the end zone.
Reimbursement, by contrast, involves an element of retrospection. Someone fronted money at time one, and someone else later made up for it at time two: "Thanks for picking up the tab for lunch today, I'll reimburse you tomorrow"; "Be sure to keep your travel expense records so the company can reimburse you when you get back"  that sort of thing.
It should be immediately apparent that the right to receive a defense is not equal to the right to receive reimbursement and cannot be equated with it. There is a distinct benefit in not having to pony up money immediately. (See Romano v. Mercury Insurance Company (2005) 128 Cal.App.4th 1333, 1342-1344, 27 Cal.Rptr.3d 784 [noting that Legislature would readily choose to require insurers, not insureds, to front money to pay for uninsured motorist claims arising out of insurer insolvencies].) Such a benefit is most acutely felt when an answer to a complaint is due in civil court and a lawyer must be found and paid to draft and file it. At the very least the benefit of a defense is the time value of money, but it also involves elements of convenience (such as not having to keep funds on hand earmarked for legal costs) and focus (not having to worry about the selection of legal counsel when one is sued).
And in fact, there are indemnity contracts (e.g., M. Perez Co. Inc. v. Base Camp Condominiums Assn. No. One (2003) 111 Cal.App.4th 456, 463, 3 Cal.Rptr.3d 563) which frame an obligation to pay attorney fees on behalf of an indemnitee expressly in terms of reimbursement, not a present duty to defend. Indeed, for what it is worth in this context, there are also insurance contracts that provide for duties of reimbursement rather than defense. (See Croskey, et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶ 7:1612, p. 7F-17 ["No duty to defend. Most D & O policies provide that the defense of a claim rests with the insureds and that the insurer has no duty to provide a defense against covered claims. Unlike CGL policies, `D & O policies generally do not obligate the carrier to provide the insured with a defense. More likely, they require the carrier to reimburse the insured for defense costs as an ingredient of `loss,' a defined term under the policy.'"].)
Accordingly, it is no surprise that indemnity contracts can easily be written so that any obligation of the indemnitor to pay the indemnitee's attorney fees is clearly determined retroactively based on the establishment of fault by the indemnitor. (E.g., Morton Thiokol, Inc. v. Metal Building Alteration Co. (1987) 193 Cal.App.3d 1025, 1027, 238 Cal.Rptr. 722.)[22]
We are forced, then, to conclude that when this subcontract used the words "and . . . defend" in the second clause of the first sentence of section 12, it was promising *808 the rendering of a present service, albeit a service triggered under narrow circumstance, and not just reimbursement of defense costs retroactively determined.[23]
The importance of our conclusion is this. Because the obligation to defend undertaken by the window manufacturer here was an obligation to provide a present "service," by definition the obligation could not have been contingent on the establishment of a subsequent indemnity obligation to pay a settlement or judgment. (Much more on that in the next subheading.) The idea that the window manufacturer had no duty to defend unless it was ultimately adjudged to be negligent is thus incorrect as a matter of the text of the contract.[24]

c. The Source of Confusion in the Problems of Exculpation and Interpretation
Now we must address an aspect of indemnity law which may have been the *809 source of the comments in the cases we will deal with in part IV.C. of this opinion: It is the well-established rule that an "indemnity" contract will not be construed to apply where the indemnitor is not negligent unless the contract specifically says so. Here is the way, for example, that the court stated the rule in Heppler v. J.M. Peters Co., supra, 73 Cal.App.4th at page 1278, 87 Cal.Rptr.2d 497: "The indemnity language contained in the preprinted subcontracts does not evidence a mutual understanding of the parties that the subcontractor would indemnify Peters [the general] even if its [obviously referring to the subcontractor] work was not negligent. Indemnity provisions are to be strictly construed against the indemnitee, and had the parties intended to include an indemnity provision that would apply regardless of the subcontractor's negligence, they would have had to use specific, unequivocal contractual language to that effect." (Ibid.) The Heppler court then restated the rule after citations: "As this court has pointed out in Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co. (1991) 234 Cal.App.3d 1724, 1737, 286 Cal.Rptr. 435, the specificity of the language used is a key factor in construction of an indemnity agreement. `[T]o obtain greater indemnity, more specific language must be used.' (Ibid.)" (Heppler, supra, 73 Cal.App.4th at p. 1278, 87 Cal.Rptr.2d 497.)
The origins of the rule can be traced, in terms of Supreme Court decisions, to Vinnell Co. v. Pacific Elec. Ry. Co. (1959) 52 Cal.2d 411, 340 P.2d 604, and ultimately to the public policy against exculpatory contracts set forth in section 1668 of the Civil Code.
In Vinnell, a contractor was hired to build a storm drain for a flood control district, but the work required that the contractor's employees enter a nearby railroad yard. The work also required that the railroad company take up its tracks to allow the work to progress. The railroad company granted the contractor the right to enter its land for the drain project, at the same time also obtaining an agreement from the contractor to hold the railroad company "harmless" from any injury suffered by the contractor or its employees "howsoever same may be caused" from the performance of any and all work done on the railroad company's property. (See Vinnell, supra, 52 Cal.2d at p. 414, 340 P.2d 604.)
One day the railroad company's employees forgot that a track had been terminated at the contractor's excavation. They switched the track so that the locomotive and cars ran off the track and into the excavation. The contractor sued the railroad company for the damage to its own work in progress, and the railroad company set up the hold harmless agreement as a defense.
The railroad company lost  there was a judgment for the contractor  and so the railroad company appealed. The California Supreme Court affirmed. In affirming, the Supreme Court treated the hold harmless agreement for what it substantively was  an exculpatory contract. Since the agreement did not specifically express a clear intention on the part of the parties to exculpate the railroad company from its own negligence (and the damage to the contractor's work from the railroad company's causing a locomotive to run over it was clearly the railroad company's own negligence), the trial court's judgment denying the railroad company any recovery was correct.
As one can see, Vinnell wasn't a typical "indemnity" case in the strict sense of paying liability to a third party. While the hold harmless agreement in Vinnell used the verb "indemnify" and was even characterized *810 as an "indemnity clause" by the court (see Vinnell, supra, 52 Cal.2d at p. 414, 340 P.2d 604), it functioned essentially as a two-way exculpatory contract. A and B had agreed that A would release B for any injuries B caused A. That function was alluded to by the court in defending its holding against the railroad's argument that the agreement would have "no practical meaning" if it wasn't enforced in the case before it. Not so, said the court  it would still "protect defendant [the railroad] against `liability' to third parties." (Id. at p. 416, 340 P.2d 604.)
However, five years later the rule of construction enunciated in Vinnell was expanded to three-way situations in Goldman v. Ecco-Phoenix, supra, 62 Cal.2d 40, 41 Cal.Rptr. 73, 396 P.2d 377.
In Goldman, the general contractor on a San Francisco firehouse project obtained a declaratory judgment that it was entitled to be defended and indemnified by the electrical subcontractor for the claims of an employee of the electrical subcontractor who fell off a platform while the firehouse was being built. But the trial court made no findings of fault on anybody's part, and that fact required the reversal. The basic rule from which the court reasoned was that if a contractor is going to be required to indemnify an indemnitee "from a loss to which his [the indemnitee's] negligence has contributed," the language must be specific. (See Goldman, supra, 62 Cal.2d at p. 44, 41 Cal.Rptr. 73, 396 P.2d 377.) However, the contract before the court was just the opposite. In that contract the sub had agreed to be "bound" to the general the way the general was "bound" to the owner, whatever that meant. In fact, the contract was twice described in the opinion as "loose and obscure." (Id. at pp. 41, 48, 41 Cal.Rptr. 73, 396 P.2d 377.) And the word "indemnity" did not even appear in it. Also, a critical clause in the contract, "extent of work provided for in this agreement" was ambiguous as to whether it meant merely (a) a loss related to the electrical sub's own obligation to install its electrical work, or, more broadly, (b) any loss in the course of its performance of the electrical work. (See id. at p. 47, 41 Cal.Rptr. 73, 396 P.2d 377.)
But the Goldman court did not stop there. Our high court added some dicta to protect against the idea that no indemnity agreement could ever validly provide for indemnification where the indemnitee was somehow at fault. (Goldman, supra, 62 Cal.2d at p. 48, 41 Cal.Rptr. 73, 396 P.2d 377.) And in this context the court made the point that exculpation should not be confused with indemnification. The general contractor in Goldman was not seeking exculpation from liability to the subcontractor's employee; rather, it was seeking to have the subcontractor pay for that liability. (Ibid.) Hence, if the contract had adequately provided for indemnification of the general "from its own negligence," the court could not say that the contract would violate public policy. (Ibid.)
We may take it that, if the Goldman court was willing to countenance the idea that an indemnity contract, if sufficiently specific, could validly require the indemnitor to pay for the indemnitee's own negligence, a fortiori a contract, if sufficiently specific, could validly require the indemnitor to pay for a defense regardless of the indemnitor's negligence. The former comes close to functioning as an exculpatory contract in violation of section 1668 of the Civil Code,[25] while the latter, as the *811 Smoketree-Lake Murray court would later point out, does not implicate exculpation at all. (See Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co., supra, 234 Cal.App.3d at pp. 1734-1738, 286 Cal.Rptr. 435 [noting distinctions between two-way exculpatory contracts and three-way indemnity contracts].)
At least two cases to date have dealt with subcontracts where the level of specificity was held sufficient to require the subcontractor-indemnitor to pay for defense costs even though the subcontractor-indemnitor was not negligent, Continental Heller Corp. v. Amtech Mechanical Services, Inc., supra, 53 Cal.App.4th 500, 61 Cal.Rptr.2d 668 and Centex Golden Construction Co. v. Dale Tile Co. (2000) 78 Cal.App.4th 992, 93 Cal.Rptr.2d 259. Both clearly held that subcontractors before them did indeed have duties to defend without a prior finding of negligence.
Continental Heller arose out an explosion at an ammonia refrigeration plant being built by a subcontractor. Injured employees of the subcontractor sued the general contractor, and the general "tendered defense" of those claims to the sub "pursuant to an indemnity agreement contained in the subcontract." (Continental Heller, supra, 53 Cal.App.4th at p. 503, 61 Cal.Rptr.2d 668.) The sub declined the offer, the general then settled the claims against it, and sought recovery of both the settlement amount and its attorney fees incurred in defending the action. Even though the trial court specifically found that the sub was not negligent, the trial court also found that the indemnity agreement did not require fault or a causal connection between the sub's work and explosion. (Ibid.)
The key language in the contract required the sub to indemnify the general "for a loss which `arises out of or is in any way connected with the performance of work under this Subcontract." Because the act of installing the refrigeration system was "`an act' carried out in `the performance of work under [the] Subcontract'" and because the general's loss was "`connected' with that act" the language applied. (Continental Heller, supra, 53 Cal.App.4th at p. 505, 61 Cal.Rptr.2d 668.) The court also specifically rejected the idea that "every cause of action for indemnity requires a showing of fault on the part of the indemnitor," and in that regard specifically pointed to language requiring indemnification for "any acts or omissions, willful misconduct or negligent conduct, whether active or passive, on the part of Subcontractor." (Ibid.) That language indicated that indemnification applied to "`any acts ...' not just" to the sub's willful or negligent conduct. (Ibid.)
Centex Golden Construction Co. v. Dale Tile Co., supra, 78 Cal.App.4th 992, 93 Cal.Rptr.2d 259 more resembled the typical construction defect case. The owner of a commercial building made a number of claims against the general contractor, including a claim for defective tile work. The general contractor settled the claims, and sought reimbursement from a tile subcontractor for both the amount paid to settle the tile claims and the attorney fees expended in defending against the owner's claim. At trial the jury determined that the tile subcontractor was not negligent. Even so, the trial court entered a judgment in favor of the general contractor for both the settlement amount and the attorney fees, and that judgment was affirmed on appeal.
On appeal, the Centex court began by noting there must be "some expression in the agreement which indicates that `the *812 indemnitor's conduct or fault is of no consequence in determining whether the indemnity obligation is triggered.'" (Centex, supra, 78 Cal.App.4th at p. 998, 93 Cal.Rptr.2d 259, quoting Heppler, supra, 73 Cal.App.4th at p. 1280, 87 Cal.Rptr.2d 497, original italics.) For the Centex court, that "some expression" was found in words (1) that the all work performed by the tile sub would be "`at the risk of Subcontractor exclusively'" and (2) that there would be indemnity for all claims covered by or incidental to the agreement, even for those which involved "`alleged or actual negligent act or omission'" of the general contractor. (Centex, supra, 78 Cal.App.4th at p. 998, 93 Cal.Rptr.2d 259.) Thus the court held that even "more than the language considered in Continental Heller, the express and exclusive assumption by [the tile sub] of `the risk' attendant to its work on the project, including allegations of negligence, plainly contemplates more than the narrow risk of its own actual negligence or fault." (Id. at p. 998, 93 Cal.Rptr.2d 259.)[26]
Here, the "expression" of an obligation without fault  albeit only in regard to the defense obligation  is found in the phrase, "and at his own expense to defend any suit or action brought against Owner founded upon the claim of such damage." (Italics added.) This is an obligation separate from the obligation in the first part of the contract to "indemnify and save Owner harmless against all claims for damages to persons or to property." It expresses an intention that the window manufacturer-subcontractor-indemnitor would have an obligation to defend suits founded upon claims that would exist regardless of the indemnitor's fault.
Such language necessarily contemplated application without an adjudication of that party's negligence, because the defense of a claim must necessarily take place before the claim itself is adjudicated. It just can't exist otherwise.
The following passage from Gray v. Zurich Insurance Co. (1966) 65 Cal.2d 263, *813 271-272, 54 Cal.Rptr. 104, 419 P.2d 168 absolutely demolishes the idea that any "defense" obligation can be made dependent on a later determination of a duty to "indemnify" in the sense being obligated to pay a settlement or judgment: "At the threshold we note that the nature of the obligation to defend is itself necessarily uncertain. Although insurers have often insisted that the duty arises only if the insurer is bound to indemnify the insured, this very contention creates a dilemma. No one can determine whether the third party suit does or does not fall within the indemnification coverage of the policy until that suit is resolved; in the instant case, the determination of whether the insured engaged in intentional, negligent or even wrongful conduct depended upon the judgment in the [underlying] suit, and, indeed, even after that judgment, no one could be positive whether it rested upon a finding of plaintiff's negligent or his intentional conduct. The carrier's obligation to indemnify inevitably will not be defined until the adjudication of the very action which it should have defended. Hence the policy contains its own seeds of uncertainty; the insurer has held out a promise that by its very nature is ambiguous." (Ibid., italics added.)
This case, then, fits with both Continental Heller and Centex in involving language that necessarily contemplated obligations not dependent on an adjudication of subcontractor negligence.

d. The Trigger of the Defense Obligation
As we have already noted, the basic rules of construction of subcontractor-indemnity contracts run in the opposite direction as insurance policies. Thus, there must be, here, narrow construction of the obligations undertaken by the subcontractor window manufacturer. That said, the language of the contract is unambiguous, and plainly called for the window manufacturer to defend the action against the developer here, because it was "founded upon the claim of such damage" growing out of the execution of the window manufacturer's work. You cannot "defend" a "claim of such damage" that depends on an adjudication of negligence in that very claim itself.
But there is more to be gleaned from the language here. Let's look again at the first clause of section 12: "Contractor does agree to indemnify and save Owner harmless against all claims for damages to persons or to property and claims for loss, damage and/or theft of homeowner's personal property growing out of the execution of the work, and at his own expense to defend any suit or action brought against Owner founded upon the claim of such damage or loss or theft."
First of all, readers should note the conjunctive nature of the clause: It is joined by an "and," with the first part involving a promise "to indemnify" and a second part involving a promise "to defend." Next, readers should notice the internally self-referential structure. The trigger of the promise to defend is in the second half of the clause, but it refers back to the first half. Thus, if one asks: "What has the subcontractor promised `to defend'"? The answer is: "any suit or action brought against Owner founded upon the claim of such damage or loss or theft." And if one asks, "What is this `claim of such damage or loss or theft'"? The answer is: "all claims for damages to persons or to property and claims for loss, damage and/or theft of homeowner's personal property growing out of the execution of the work."
Such language is surely clear enough. If there is a suit or action founded upon a claim for "such damage" ... growing out *814 of the execution of the "work"  and, to be true, the word "work" and the phrase "such damage" must be given a narrow construction  the subcontractor has promised "to defend" that suit or action.[27]
And that was, of course, the case here. Even given the appropriately narrow construction, i.e., a small, tight circle centered on claims growing out of the subcontractor's own work, the homeowners' lawsuits fell within that small circle. The homeowners alleged property damage resulting from the leaky windows, allegedly negligently manufactured by the window manufacturer which surely are claims "growing out of the execution" of the specific work of the window manufacturer, so even if we define "work" and "such damage" most narrowly to mean just the work of the window manufacturer and "such damage" as is claimed to grow of its "execution," the duty to defend was triggered.
Indeed, the phrase in the agreement, "the claim of such damage" serves an important narrowing function as regards the scope of the subcontractor's duty to defend. The subcontractor certainly does not promise to defend any claims brought against the general; it only promises to defend suits or actions founded upon the claim of such damage as grow out of the execution of the subcontractor's own work. In this case, however, the suit against the developer was founded precisely upon "the claim of such damage" as grew out of the execution of the window manufacturer's work  the homeowners complained of leaky and fogging windows and the making of those windows was exactly the window manufacturer's work. The "claim of such damage" against the developer in this case hit the bull's eye of the indemnitor's work. We are thus spared the need, in this opinion, to delve into the cases which try to chart the scope of an indemnity obligation where no claim is founded on the indemnitor's work at all.
Finally, we cannot ignore the prominent use of the word "claim" and the phrase "at his own expense" in the context of the contract's obligation to defend. The word "claim" is used in the context of a lawsuit founded upon a claim. The importance of the usage is that "claims" can be false, based on no actual negligence or defect on the part of the subcontractor. Yet the contract still requires the subcontractor to defend suits based on claims growing out of the execution of the subcontractor's work. Even giving "growing out" it proper narrow construction, there still must be some possibility that the subcontractor will have to defend actions founded upon certain claims. Otherwise, a self-contradiction would be read into the contract, *815 and the word "defend" would be deprived of its ordinary meaning.

e. Conclusion of Analysis of the Subcontract
In sum, the subcontract agreement between the developer and the window manufacturer in this case, even narrowly construed, plainly and unambiguously called for the window manufacturer to provide a defense, i.e., pay for an attorney or attorneys to conduct that defense, of the homeowners' suit, at least to the degree the suit was "founded upon" claims of window problems, independent of whether the window manufacturer was itself ever held to be responsible for those window problems. The claim, after all, was "founded upon" a claim of damage from those alleged window problems.
Two cautionary notes are now required. As we have stressed throughout this opinion, the precise scope of what a subcontractor must defend must be as narrow as the language will allow. So, for example, we do not apply in this case (and, given the trial judge's allocation, there is no need to) the rule in Presley Homes v. American States Ins. Co. (2001) 90 Cal.App.4th 571, 108 Cal.Rptr.2d 686. In Presley Homes, this court held that a subcontractor's insurer's duty to defend a general contractor, pursuant to an additional insured endorsement, meant providing "a complete defense" (see id. at p. 577, 108 Cal.Rptr.2d 686). There, we reasoned that any injustice to the subcontractor's insurer in defending claims not otherwise arising out of the insured subcontractor's work could be remedied by a contribution action against other insurers. (Ibid.) Accordingly, we most certainly do not say that a subcontractor is necessarily responsible for providing a "complete defense" to an action founded upon a claim growing out of a subcontractor's work. We only say that this subcontract obligated this window manufacturer to pay for its half share of defense costs reasonably attributable to the homeowners' window claims, i.e., clearly "growing out" of the subcontractor's own work. No one should assert that this opinion stands for any proposition broader than that.
The second cautionary note involves the question of when, precisely, the defense obligation is triggered. This opinion must not be read as importing the Gray "potentiality rule" from insurance jurisprudence into the relationship between a general contractor and subcontractor. There simply is no substitute for reading the contract. All we are saying is that if the contract says that there is an obligation to defend a suit founded on a claim of "such damage" as grows out of a subcontractor's work, and the suit clearly is founded on the subcontractor's work as this suit was, the defense obligation is triggered even if the claim itself ultimately proves to be unfounded. Surely even alleged window fogging and leaking is a "claim" that "grows out" of a window manufacturer's work. Any other conclusion would render the obligation to "defend" meaningless, or distort the word "defend" to mean what it doesn't, i.e., "reimburse upon a retroactive finding of negligence."

C. The Case Law Bearing on the Subcontractor's Obligation to Defend

1. General Preliminary Considerations

If we were writing on a blank slate, we might end this part of the opinion right here. The trial court clearly read the subcontract correctly, interpreted it in accord with the rules of strict construction set forth in, for example, Goldman, and declared the unambiguous obligation of the window subcontractor under the indemnity agreement in this case.
*816 However, as mentioned above, the window subcontractor has proffered a number of cases which, it says, stand for the opposite conclusion, namely that a condition precedent of a subcontractor's duty to defend is a determination of its negligence. To show what those cases, in particular Heppler v. J.M. Peters Co., supra, 73 Cal.App.4th 1265, 87 Cal.Rptr.2d 497, really say, is going to require some fairly tedious hermeneutics. However, we can put our conclusions in a nutshell here: We do not disagree with Heppler and the other cases which we will now discuss. Those cases merely assumed that a defense obligation was part of (or subsumed within) a classic indemnity obligation, and therefore (as discussed in depth in part IV.B.3.c. above) assumed that some express reference to the indemnitor's own "negligence" was required for the defense obligation to survive. But none of these cases ever shut the door on the recognition of a defense obligation where there is explicit language obligating a party "to defend" a suit, and that obligation is independent of the obligation to make good a loss (classic indemnity).
In that regard, it is amazing that the parties in their briefs so thoroughly disagree on what the rule of the Heppler decision really is. The developer thinks that Heppler is limited to what we have called "classic indemnity," i.e., the obligation to pay a settlement or judgment, and has nothing to say about defense, i.e., the obligation to provide legal services to minimize any judgment in a lawsuit. The window manufacturer, with equal confidence, asserts that Heppler sets up a determination of negligence as a prerequisite to a subcontractor's duty to defend.
We will now explore in chronological order each of the cases arguably standing for the idea that an adjudication of negligence is an absolute prerequisite for a duty to defend.

2. Peter Culley v. Superior Court

Peter Culley & Associates v. Superior Court, supra, 10 Cal.App.4th 1484, 13 Cal.Rptr.2d 624 was not a typical condo construction defect case. Rather, it arose out of the delay occasioned in the construction of a condominium project because a structural engineering firm had designed foundation footings too short so that the footings were not deep enough to reach load bearing soil.
The developer sued the architectural firm that had itself hired the structural engineering firm. (Technically, the suit was a cross-complaint in response to the architectural firm's first suit to collect fees from the developer.) The structural engineering firm had promised the architectural firm to "defend, indemnify and hold [it] harmless" from all loss "resulting from" the structural engineering firm's "negligent performance of services" under the subcontract, so the architectural firm, of course, requested a defense from the structural engineering firm now that the former had been sued by the developer. The structural engineering firm rejected the request. (Peter Culley & Associates v. Superior Court, supra, 10 Cal.App.4th at pp. 1488-1489, 13 Cal.Rptr.2d 624.)
The developer and the architectural firm settled the developer's suit against the architectural firm; the architectural firm ended up paying the developer $225,000, of which $200,000 was ascribed to faulty foundation design work (i.e., the work done by the structural engineers). (Peter Culley & Associates v. Superior Court, supra, 10 Cal.App.4th at p. 1489, 13 Cal.Rptr.2d 624.) The architectural firm also assigned to the developer "its indemnity rights" against the structural engineering firm, and agreed to cooperate in an action *817 against the structural engineering firm. (Ibid.)
The developer, now in the shoes of its architect, filed suit against the structural engineering firm. The trial court bifurcated the case, with different juries deciding (a) whether there had even been a proper tender to the structural engineering firm in the first place, and (b) whether the architects' "active negligence barred indemnity." (Peter Culley & Associates v. Superior Court, supra, 10 Cal.App.4th at p. 1489, 13 Cal.Rptr.2d 624.) Even so, the trial court issued a nonsuit against the structural engineering firm on the question of the architect's negligence. The structural engineers had failed to produce expert evidence on the architect's standard of care. The net effect of the ruling was that the structural engineers could not defeat their indemnity obligation by showing that the architects were actively negligent. (See id. at p. 1492, 13 Cal.Rptr.2d 624, following a long quotation from Rossmoor Sanitation, Inc. v. Pylon, Inc., supra, 13 Cal.3d 622, 628-629, 119 Cal.Rptr. 449, 532 P.2d 97.)
But the developer also tried to use its settlement with the architect as a sword against the structural engineers. Civil Code section 2778, subdivision 5 says that if the indemnitor (in Peter Culley, the structural engineers) neglects to defend the indemnitee (in Peter Culley, the architects), a recovery against the indemnitee "suffered in good faith" is "conclusive" in favor of the indemnitee against the indemnitor. (Peter Culley, supra, 10 Cal.App.4th at p. 1488, 1495-1496, 13 Cal.Rptr.2d 624.) Seizing on that "is conclusive" language from the statute, the developer sought the trial court's imprimatur on the "good faith" of the developer-architect settlement. The idea was that the $200,000 paid by the architects would be conclusive against the structural engineers. The developer got its wish, embodied in a good faith settlement order, and the structural engineers then sought writ relief from that order.
The Peter Culley court zeroed in on the trial court's error of blurring the distinction between contractual indemnity rights on the one hand, and the right of a settling party in good faith to obtain immunity from actions for equitable indemnity under section 877.6 of the Code of Civil Procedure on the other. (See Peter Culley, supra, 10 Cal.App.4th at p. 1490, 13 Cal.Rptr.2d 624 ["The proceedings below have become confused by a blurring of the distinctions between section 877.6 proceedings and proceedings to enforce contractual indemnity rights."].)
Still concerned with the effect of the developer-architect settlement (i.e., whether conclusive against the engineers), the Peter Culley court then turned its attention to the actual language of the architect-engineer indemnity agreement, and discovered that there were two interpretations: The architects claimed that the indemnity agreement required the engineers to defend and indemnify "whenever" there was "an allegation of negligence" while the engineers claimed that "actual negligence" was a "condition" of the obligation to defend and indemnify. (See Peter Culley, supra, 10 Cal.App.4th at p. 1494, 13 Cal.Rptr.2d 624, italics added.)
But the court's concern was not with the question of whether there was a duty to defend that might be independent of a duty to indemnify. Rather, the court was concerned with whether a principle of insurance law (that when an insurer wrongfully fails to defend, a settlement made by the insured is presumptive evidence that the insured was liable to the third party claimant) should apply to the case. (See Peter Culley, supra, 10 Cal.App.4th at p. 1494, 13 Cal.Rptr.2d 624, citing Isaacson v. *818 California Ins. Guarantee Assn. (1988) 44 Cal.3d 775, 791, 244 Cal.Rptr. 655, 750 P.2d 297.) And in fact the developer (again, standing in the shoes of the architect) wanted to use the "conclusive" language of section 2778, subdivision 5, to extend the rule from mere "presumptive evidence" to absolutely conclusive. (Peter Culley, supra, 10 Cal.App.4th at pp. 1494-1495, 13 Cal.Rptr.2d 624.)
But that argument didn't work, since the phrase in the statute, "recovery ... suffered" would not refer to a negotiated settlement, but a judgment. (Peter Culley, supra, 10 Cal.App.4th at pp. 1495-1496, 13 Cal.Rptr.2d 624.) It was in that context that the court wrote a sentence linking indemnification with negligence, though it did so without any reference to a duty to defend or provide any authority to back up the sentence. The point of the sentence was not that a duty to defend could not possibly exist independently of a duty to indemnify, but that classic indemnification (i.e., payment of settlement or judgment) requires negligence regardless of whether the loss indemnified is by settlement or judgment: "We also conclude that indemnification for either a recovery by judgment or a settlement presupposes that other contractual conditions for indemnity, such as the indemnitor's negligence, have been proven." (Id. at p. 1496, 13 Cal.Rptr.2d 624.) The court then explicated a series of insurance cases to conclude that a settlement is only presumptive evidence of liability and its amount (see id. at p. 1497, 13 Cal.Rptr.2d 624), and thus could be overcome by proof that the settlement was unreasonable (ibid.).
Moreover, the allocation made in the developer-architect's settlement wasn't even entitled to presumptive effect, given that the allocation had no effect on the architect: It was no skin off the architect's back that most of the settlement was ascribed to structural engineering flaws. (Peter Culley, supra, 10 Cal.App.4th at pp. 1497-1498, 13 Cal.Rptr.2d 624.)
Finally, the Peter Culley court recognized how the confusion of section 877.6 "good faith" with section 2778, subdivision 5 "good faith" had inverted the proper burdens of proof. An indemnitee has the burden of proving liability and its extent (see Peter Culley, supra, 10 Cal.App.4th at p. 1498, 13 Cal.Rptr.2d 624), while the trial court had, in the case before it, put the burden of proof on the indemnitor by conflating the two kinds of good faith. (Ibid.) Because all the various trial court's errors were "virtually certain" to taint any future judgment, the Peter Culley court granted the petition and ordered the trial court to vacate its "good faith settlement order." (Id. at p. 1499, 13 Cal.Rptr.2d 624.)
The point is: The Peter Culley decision was focused on the implications of good faith settlements. The court never confronted the issue of whether a duty to "defend" can ever stand independently of a duty to indemnify because it was focused on the legal effects of a settlement, not a claim for defense costs.

3. Regan Roofing v. Superior Court

Interestingly enough, the window manufacturer has not showcased what is arguably the strongest case for its position, Regan Roofing Co. v. Superior Court, supra, 24 Cal.App.4th 425, 29 Cal.Rptr.2d 413. We mention that, because some commentators have indeed read Regan Roofing for the proposition that Regan Roofing makes a subcontractor's obligation to defend dependent on a determination of its negligence triggering its duty to pay any judgment or settlement for that negligence. (See Bruner & O'Connor, Construction Law (2002) § 10:27 ["In ruling that the subcontractors were not bound, as a matter of law, to provide such a defense, *819 the [Regan Roofing] court construed the defense obligation as dependent upon the existence of the underlying indemnity obligation."]; Mudge, Saving for a Rainy Day (May 2005) 47 O.C. Law. 34, 43 [citing Regan Roofing for the proposition that "the subcontractor has no obligation to defend the developer/contractor until there is a declaration of negligence"].)
Regan Roofing started out prosaically enough  yet another San Diego area construction defect case. A condominium homeowners association sued the developer, and the developer cross-complained against some 24 subcontractors. A typical or "exemplar" subcontract between the developer and many (but not all) of the subs specifically required subcontractors to defend any suit brought against the developer arising out of the subcontractor's performance of the subcontract.[28]
The developer soon sought summary adjudication, and in one motion tried to establish that all 24 subcontractors had a duty to defend the developer in the suit brought against it by the homeowners association. The trial court agreed. The subs then sought writ relief.
In granting the petition requiring the trial court to vacate its order, the court issued what must be characterized as a somewhat enigmatic opinion, i.e., one that straddled both substantive and procedural issues in the case. On the one hand, for example, there were points in the opinion where the court seemed to be expressly limiting its decision to the idea that the duty to defend as just found by the trial court was "not a proper subject of summary adjudication." (Regan Roofing, supra, 24 Cal.App.4th at pp. 429, 432, 435, 437, 29 Cal.Rptr.2d 413.)[29]
But there is a passage in the opinion where the court does address the issue of whether a subcontractor-indemnitor's duty to defend can ever arise prior to an actual determination of the subcontractor's negligence.
*820 Here it is, including all cites: "We believe summary adjudication of the duty to defend and its relationship to the duty to indemnify (i.e., the scope of `the matters embraced by the indemnity') is premature. No determination has yet been made as to whether the subcontractors were negligent in the performance of their work, giving rise to a duty to indemnify and a related duty to defend. Pacific Scene [the developer] has not clearly established that under this indemnity clause, the duty to defend against claims of liability is entirely free-standing of the duty to indemnify for liability arising out of a subcontractor's negligence. (Civ.Code, § 2778, subd. 4.) While an insurance company has a broad duty to defend, due to the possibility of coverage under the policy, a contract of indemnity is not construed in precisely the same manner as is an insurance contract, because it is not necessarily an adhesion contract as is an insurance policy. (Goldman v. Ecco-Phoenix Elec. Corp. (1964) 62 Cal.2d 40, 49, 41 Cal.Rptr. 73, 396 P.2d 377.) It is as yet unclear whether the subcontractors are being expected to defend the developer, Pacific Scene, against claims for which it may be strictly liable, but for which the subcontractors are not strictly liable. (La Jolla Village Homeowners' Assn. v. Superior Court (1989) 212 Cal.App.3d 1131, 1144, 261 Cal.Rptr. 146; GEM Developers v. Hallcraft Homes of San Diego, Inc. (1989) 213 Cal.App.3d 419, 429-430, 261 Cal.Rptr. 626.)" (Regan Roofing, supra, 24 Cal.App.4th at pp. 436-437, 29 Cal.Rptr.2d 413.)
Three points about this passage bear noting.
First, the passage (particularly as shown in that final citation to La Jolla Village Homeowners' Assn.) was premised on the idea that any duty to defend assumed by a subcontractor would expose that subcontractor to, in effect, strict liability when it had already been established (by La Jolla Village Homeowners' Assn.) that subcontractors could not be held strictly liable. As we have seen, with the Supreme Court's decision in Jimenez v. Superior Court, supra, 29 Cal.4th 473, 127 Cal.Rptr.2d 614, 58 P.3d 450, that assumption is no longer viable.
Two, the Regan Roofing court did not directly confront the question of whether a duty to defend might exist separately from a duty to pay a settlement or judgment because of the mechanics of an obligation to actually defend an existing suit. Thus the court does not address the chicken-egg conundrum inherent in any promise (however so narrow in scope) to "defend" another, or the solution to it, brilliantly articulated almost 40 years ago by Justice Traynor in the passage from Gray v. Zurich Insurance Co., supra, 65 Cal.2d at pp. 271-272, 54 Cal.Rptr. 104, 419 P.2d 168, quoted above in part IV.B.3.c. The closest the Regan Roofing court came to confronting the problem was in its use of the word "precisely." That is, the Regan Roofing court was content to say that because subcontractor indemnity contracts are not construed in "precisely" the same manner as insurance contracts, nothing more needed to be said why the word defend in a subcontractor indemnity contract should not be given its ordinary and plain meaning. Of course, just because indemnity contracts are not "precisely" construed like insurance contracts (how true!) does not mean that an obligation to defend undertaken in a subcontractor indemnity contract is meaningless.
Three, to the degree that the Regan Roofing court based, on statutory grounds, the idea that the summary adjudication of the duty to defend on the part of the subcontractors was "premature" because of the absence of a determination of actual negligence law, the court appears to have *821 misconstrued the relevant statute. As we show in part IV.D.1 of this opinion, far from precluding any duty of defense, Civil Code section 2778, subdivision (4), with its "embraced by" language, actually contemplates a present duty to defend prior to any adjudication of indemnitor negligence.
The Regan Roofing court ended by alluding to (in a paragraph that begins "moreover") certain practicalities. The court appears to have been concerned with the problem of enforcing the exemplar contract given what it perceived to be its undefined boundaries. Thus, each of the "approximately 24 subcontractors" had "performed work on a different phase or area of construction" and in the same breath the Regan Roofing court added, "their duty to defend is apparently limited by the clause to the issues concerning the type of work they did," thus the developer was seeking "to have a series of related defenses provided." (Regan Roofing, supra, 24 Cal.App.4th at p. 437, 29 Cal.Rptr.2d 413.) And, while such a "fragmented duty to defend" would pose "no particular problems with regard to any ultimate division of the costs of defense, as part of the indemnification duty, it does pose practical problems for an immediate or current duty to defend (or to pay pro rata for another's defense) up to and including trial." (Ibid.) Why? In the next sentence, the court said: "There has been as yet no determination of any breach of this duty, which would allow the consequences of a failure to defend to be made clear. The [trial court's] ruling is thus preliminary or advisory in character, and does not fully dispose of any portion of the action" and therefore was inconsistent with the summary judgment statute. (Ibid.)
This passage also requires some commentary.
First, the court indeed appears to have taken for granted the idea that there can be no breach of a subcontractor's duty to defend until a duty to indemnify  meaning, pay a judgment or settlement  had been established. Otherwise the reference to having had as yet no determination of "breach of this duty, which would allow the consequences of a failure to defend to be made clear" makes no sense. There was, after all, no question in Regan Roofing that all 24 of the subcontractors had rejected the developer's demand for a defense. (See Regan Roofing, supra, 24 Cal.App.4th at p. 430, 29 Cal.Rptr.2d 413.)
Second, the primary focus of the Regan Roofing court was procedural. Much of the opinion was in fact devoted to an exploration of the summary judgment statute (see Regan Roofing, supra, 24 Cal.App.4th at pp. 432-436, 29 Cal.Rptr.2d 413), with the main point seeming to be that adjudication of a contractual duty to defend is not appropriate when the complaint also seeks relief in addition to the adjudication of that duty, including damages for breach of contract. (See id. at pp. 435-436, 29 Cal.Rptr.2d 413.)[30] Thus, the implication of the court's procedural discussion was *822 that the developer should simply have filed a declaratory relief action seeking only the adjudication of the duty to defend.
If there still be any doubt that Regan Roofing should not be read as precluding an obligation to defend without negligence, it has been dispelled by the same court that issued it (albeit a different panel), in Centex Golden Construction Co. v. Dale Tile Co., supra, 78 Cal.App.4th 992, 93 Cal.Rptr.2d 259. As we have seen, Centex clearly allows for the possibility of a subcontractor's obligation to indemnify without subcontractor negligence. The Centex court, with more brevity and elegance than we have managed in this opinion, dispatched Regan Roofing this way: "Contrary to [the tile subcontractor's] argument, nothing we said in Regan Roofing [citation] is inconsistent with the freedom of contract discussed in Continental Heller. In Regan Roofing we merely held that it was premature to decide whether a subcontractor could be required to contribute to the defense of a claim before either its fault had been established or any determination had been made that such a defense existed notwithstanding fault. We did not suggest that an agreement which required indemnity from a faultless indemnitor was in any manner improper or unusual." (Centex, supra, 78 Cal.App.4th at p. 997, fn. 1, 93 Cal.Rptr.2d 259.)[31]

4. Heppler v. J.M. Peters Co.

Heppler requires some detailed parsing, which we will now begin. In broad overview, though, two conclusions emerge: (1) Like Regan Roofing, Heppler was based on the premise that subcontractors could never be strictly liable. Thus to the degree that one might arguably extract from Heppler the idea that negligence is a per se prerequisite before a subcontractor can have any indemnity obligation (whether "classic indemnity" or even defense and indemnity), the court's analysis ultimately rested on the now-overruled La Jolla Village Homeowners' Assn. decision. (2) Like Regan Roofing, Heppler never specifically addressed the distinction between the specific obligation to defend a "claim" and classic indemnity in the sense of paying for a settlement or judgment. So in that respect the case is governed by the rule that cases are not authority for propositions not considered. (People v. Mazurette (2001) 24 Cal.4th 789, 797, 102 Cal.Rptr.2d 555, 14 P.3d 227.)[32]
In Heppler, a developer of a large residential tract used four subcontractors: a roofer, a concrete slabber, a landscaper and a grader. A group of homeowners sued the developer for construction defects, including defective roofs and foundations *823 and soils claims; the homeowners proceeded on, among other theories, strict liability. (See Heppler, supra, 73 Cal.App.4th at pp. 1272-1273, 87 Cal.Rptr.2d 497.)
The developer tendered its defense of the homeowners' suits, including a class action, to the four subcontractors, who "either refused or did not respond to the tender." (See Heppler, supra, 73 Cal.App.4th at p. 1273, 87 Cal.Rptr.2d 497.) The developer settled the class action for about $5.3 million plus an assignment of its "indemnity rights" against the nonsettling subcontractors. (The $5.3 million was allocated among three categories of claims  roofing, structural and soils, with most of the money, $4.1 million, allocated to soils claims.)[33]
So, the homeowners, now standing in the shoes of the developer, turned around and sued the subcontractors. The trial court determined that negligence was a prerequisite for each subcontractors' "indemnity obligation." (See Heppler, supra, 73 Cal.App.4th at p. 1274, 87 Cal.Rptr.2d 497.) When the case went to the jury only the roofer was found to be negligent. The judgment against the roofer included about $140,000 "as contractual damages" for its "failure to defend" the developer "pursuant to the indemnity provision, in addition to the $117,000 negligence" damages. (Ibid.)
On appeal, the homeowners (in the shoes of the developer) attacked, among other rulings, the trial court's determination that "the indemnity provisions at issue did not apply unless plaintiffs proved the subcontractors were at fault." (See Heppler, supra, 73 Cal.App.4th at p. 1275, 87 Cal.Rptr.2d 497.) Or, as the court quickly recharacterized the challenge, the homeowners were saying the trial court was wrong to determine that "subcontractor fault (negligence plus causation) was a prerequisite to trigger the contractual obligation to indemnify under these subcontracts." (Ibid.)
Then followed what is, for our purposes, the most important part of the Heppler court's discussion, under the subheading "Indemnitor Negligence as Trigger to Indemnity Obligation." (See Heppler, supra, 73 Cal.App.4th at pp. 1275-1281, 87 Cal.Rptr.2d 497.)
The discussion began with the introductory theme, pegged at both the beginning and end by quotes from Rossmoor Sanitation, Inc. v. Pylon, Inc., supra, 13 Cal.3d 622, 119 Cal.Rptr. 449, 532 P.2d 97, that, ultimately, indemnity contracts are still contracts, and ascertaining what a particular indemnity agreement provides "`turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control.'" (Heppler, supra, 73 Cal.App.4th at p. 1277, 87 Cal.Rptr.2d 497, quoting Rossmoor Sanitation, supra, 13 Cal.3d at p. 633, 119 Cal.Rptr. 449, 532 P.2d 97.)
Having established the essentially contractual nature of the issue, the Heppler court turned to the specific contracts before the court. (See Heppler, supra, 73 Cal.App.4th at pp. 1277-1279, 87 Cal.Rptr.2d 497.) It led off with a topic sentence focusing on classic indemnity, without regard to any special problem inherent in a separate obligation to defend a claim: "Given the contractual language and commercial context in which they arise, the indemnity provisions, reasonably read, did not obligate the subcontractors to indemnify [the developer] for [the developer's] liability *824 unless such liability was attributable to them because of their negligent conduct." (Id. at p. 1277, 87 Cal.Rptr.2d 497.)
Then came two paragraphs to back up the assertion. Those two paragraphs, however, merely described, respectively, two sets of indemnity provisions, the first with the grader and landscaper, the second with the concrete slabber and the roofer. For reader convenience we reproduce those paragraphs in the margin. Readers can see for themselves that the court was merely describing contractual provisions which, granted, did contain the word "defend" in them.[34] It was not analyzing them.
After that description the Heppler court immediately segued to the conclusion that the "indemnity language contained in the preprinted subcontracts does not evidence a mutual understanding of the parties that the subcontractor would indemnify [the developer] even if its work was not negligent." (Heppler, supra, 73 Cal.App.4th at p. 1278, 87 Cal.Rptr.2d 497.) For that conclusion it cited the rule, which we have already discussed at length (and in the process of which quoted Heppler), set down in the Goldman decision that "specific, unequivocal contractual language" is needed for "an indemnity provision that would apply regardless of the subcontractor's negligence." (See ibid., citing Goldman, supra, 62 Cal.2d at p. 44, 41 Cal.Rptr. 73, 396 P.2d 377.)
Then came, as relates the idea of subcontractor negligence, the intellectual innards of the Heppler decision: Two paragraphs, beginning in the middle of page 1278 and continuing toward the end of page 1279, that do not reference any specific contractual language, but rather the "attendant circumstances" involving subcontractors who work on "mass-produced residences." (See Heppler, supra, 73 Cal.App.4th at p. 1278, 87 Cal.Rptr.2d 497.)
In these two paragraphs, the Heppler court reasons from the economic circumstances of mass-produced homes to a particular reading of the contracts at issue. Plainly, those economic circumstances were the basis of the court's reading of the contract. (The same economic circumstances had been the basis of the reasoning for the distinction which the La Jolla Village Homeowners' Assn. court had drawn between subs and developers for purposes of strict liability.)
We now quote the key passage in the margin, from the second of these paragraphs. Readers of the passage should note that the Heppler court does not address any specific language in the indemnity *825 agreements, but rather premises its conclusion on the La Jolla Village Homeowners' Assn. case: Subcontractors cannot be held strictly liable.[35] And in fact the paragraph ends with a long quotation from La Jolla Village Homeowners' Assn. which is basically about policy and economics and not about contract language. (See Heppler, supra, 73 Cal.App.4th at p. 1279, 87 Cal.Rptr.2d 497.)
With that, the Heppler court had but one obstacle in the way of affirming the trial court's decision that the negligence was a prerequisite for the subcontractors' "indemnity obligation"  the Continental Heller decision two years before. As we have seen, Continental Heller cannot be reconciled with the idea that there is an absolute requirement of negligence for defense or even classic indemnity.
For the Heppler court, Continental Heller was "clearly distinguishable." (Heppler, supra, 73 Cal.App.4th at p. 1279, 87 Cal.Rptr.2d 497.) On this point the Heppler court spent one sentence on the actual differences in contractual language in the two cases.[36] But the court followed that one, lonely sentence with three paragraphs on the theme of policy and economics and why subcontractors should be treated differently than developers,[37] and which again relied heavily on La Jolla Village Homeowners' Assn. (Heppler, supra, 73 Cal.App.4th at pp. 1280-1281, 87 Cal.Rptr.2d 497.) And with that, the Heppler court ended its discussion on the negligence-prerequisite issue.
Two more aspects of the Heppler decision, however, merit some attention. First, the homeowners had wanted a jury instruction that they were entitled to a rebuttable presumption that the three non-settling subs were still liable for the amounts the developer had paid to settle claims. In that context the Heppler court made some observations contrasting subcontractors with insurers, and repeated Regan Roofing's metaphor of subcontractors *826 having no "free-standing" duties of defense as insurers do. We quote the passage in the margin.[38] Readers should note that, just like Regan Roofing, the Heppler court found it sufficient to make the general point that subcontracts are evaluated differently than insurance contracts without also explaining just what subcontracts actually do provide, or how a defense obligation can ever arise if it is contingent on a subsequent adjudication of negligence.
Second, still later in the opinion the Heppler court still had to deal with the roofer's appeal. The roofer had, after all, been found negligent, and part of the judgment against it included attorney fees expended by the developer up to the time of the assignment to the homeowner-plaintiffs. Here, we recognize that there is some textual support for the idea that when the Heppler court said "indemnity," it did mean, yes, defense costs as well. (Cf. also Erickson v. R.E.M. Concepts, Inc. (2005) 126 Cal.App.4th 1073, 1082, 25 Cal.Rptr.3d 39 [observing that trial court read Heppler for proposition that negligence must be demonstrated to trigger "indemnity obligations"  plural].) In the opening paragraph of its discussion, the Heppler court uses the word "indemnity" as if it subsumes defense costs. We also quote it in the margin.[39]
So what are we to make of Heppler? The developer in the case before us urges us to distinguish Heppler as only applying to classic indemnity as distinct from a separate defense obligation. Alas, that distinction, when Heppler is read closely, would appear to be wishful thinking on the part of the developer. While the Heppler court never actually confronted the language in the contracts obligating the subcontractors to defend claims, it seems reasonably clear that the Heppler court treated the defense obligation as part and parcel of a more general "indemnity" obligation which, by its lights, rose or fell depending on a finding of negligence.
That said, it cannot be denied that the Heppler court did not, except only by oblique *827 implication, ever grapple with the contract language obligating the subs to "defend" certain claims. So it cannot be maintained, in a case like the one before us, that Heppler would require reversal. Cases are not authority for propositions not considered, and the Heppler court certainly never (we can say that having waded through it practically paragraph by paragraph) directly confronted the issue of whether a defense obligation (as distinct from a reimbursement obligation) could ever exist if it depended on a subsequent adjudication of negligence.[40]
Heppler's comment about the absence of an analogy between insurers and subcontractors bears noting at this point. The comment is quite true. As we have seen, insurers cannot be equated with subcontractors (at the very least, the Goldman case won't allow it), but it does not logically follow that just because insurers generally have "free-standing" duties of defense that subcontractors can never assume "free-standing" duties of defense. As we have emphasized throughout this opinion, any such "free-standing" duty must be as narrow as the contract language will allow, and its trigger must be similarly narrow. But just because subcontractors are not insurers does not mean that under no circumstances can they ever assume a duty to defend.[41]
And even if we were to consider Heppler as precedent on the point we would respectfully decline to follow it. Primarily, as several of the quotations in the margin readily demonstrate, the Heppler court relied on a now-overruled case, La Jolla Village Homeowners' Assn., and for the very point it was overruled. That overruling is particularly salient in the case before us, where the subcontractor is a manufacturer, and thus clearly within the ambit of strict liability set down in Jimenez v. Superior Court (2002) 29 Cal.4th 473, 127 Cal.Rptr.2d 614, 58 P.3d 450.
Finally, as in Regan Roofing, there is a postscript to Heppler provided us by the Centex court. In a short footnote, Centex stated that "[n]o such express and broad assumption of risk" appeared in the Heppler subcontracts as appeared before the Centex court. But it did not elaborate, *828 and, as we have seen, the subcontract in Centex did indeed make the tile sub responsible even for the "actual negligent act" of the general. However, the Centex court was much more effusive in distinguishing Heppler on the basis of its "commercial setting" and "commercial context"  on that point the Centex court reiterated Heppler's major theme that subs should be treated differently than generals or developers as far as strict liability is concerned. But that ground of differentiation was to be expected, since Centex was decided prior to the overruling of La Jolla Village Homeowners' Assn.

5. Mel Clayton Ford

Mel Clayton Ford v. Ford Motor Co., supra, 104 Cal.App.4th 46, 127 Cal.Rptr.2d 759 uttered some dicta that can be read for the idea that negligence is a prerequisite to any duty to defend, but it did so only in the context of analyzing what, if any, presumptions might attach from a "good faith settlement" made by an indemnitee after the indemnitor had failed to defend. When you look at what the case actually held, the case cannot be read as stare decisis for that proposition.
In Mel Clayton Ford, an automobile manufacturer had contracted to defend and indemnify one of its dealers for lawsuits, complaints or claims "arising out of an occurrence caused solely by" production defects. An F250 truck erupted in flames on the road. The dealer, as well as Ford, were sued for products liability. The dealer requested a defense from Ford. Ford refused, and the dealer eventually settled with its own money, and then filed a complaint against Ford for breach of an "express indemnity contract" while Ford itself cross-complained against the dealer for (non-contractual) equitable indemnity. (See Mel Clayton Ford, supra, 104 Cal.App.4th at p. 51, 127 Cal.Rptr.2d 759.) The trial court later granted three seriatim summary adjudication motions: (1) Ford had a duty to defend the dealer in the underlying action; (2) the dealer had incurred a certain amount of fees and settlement costs in the underlying action; and, shades of the Peter Culley case, (3) the dealers' settlement with the underlying plaintiffs was in good faith under section 877.6 of the Code of Civil Procedure.
In the wake of its good faith settlement finding, the trial court then granted the dealer's summary judgment motion directed against Ford's cross-complaint on the theory that the good faith determination indeed barred any action for equitable indemnity, and there was no contract right on Ford's part to seek indemnification either. In the wake of that determination, the trial court concluded that all issues were resolved and it then granted judgment to the dealer in an amount that included the amounts the dealer had incurred to defend and settle the underlying action.
The Mel Clayton Ford opinion was only partially published, so we do not know why Ford did not owe the money incurred by the dealer to defend itself in the underlying lawsuit (and, inferentially, why Ford had no duty to defend the dealer in that lawsuit in the first place), though the court gave a hint in some introductory language prior to its substantive discussion  namely, that Ford's duty to defend was triggered "only where the occurrence was caused solely by a production defect, and not whenever product liability was one of the allegations of the underlying complaint." (Mel Clayton Ford, supra, 104 Cal.App.4th at p. 55, 127 Cal.Rptr.2d 759.)
Clearly, though, the Mel Clayton Ford court's primary focus was on the misuse of the statutory procedure for good faith settlements. That procedure, as in Peter *829 Culley, was once again being used offensively to establish an amount due under an indemnity contract. (See Mel Clayton Ford, supra, 104 Cal.App.4th at p. 58, 127 Cal.Rptr.2d 759.) And it was in that context that the court relied on Heppler (and also Peter Culley & Associates v. Superior Court, supra, 10 Cal.App.4th 1484, 13 Cal.Rptr.2d 624) to show that the good faith settlement procedure was not a shortcut means of establishing liability under an indemnity contract.
However, in the process, the Mel Clayton Ford opinion did indeed utter some language, ostensibly based on Heppler and Peter Culley, equating the duty to defend with a duty to reimburse contingent on a finding that liability for indemnification had been triggered. Here it is: "The holdings in Heppler and Peter Culley make clear that there are no shortcuts in this area. If the parties' agreement provides for indemnification and defense only where the indemnitee is not negligent, then the indemnitee must prove through admissible evidence in the action for reimbursement that it was not negligent in the underlying matter, or was at most passively negligent. Tempting as it may be to rely on good faith motions and conclusive presumptions, they simply have no place where the indemnitee has never litigated the issue of negligence, and is seeking to use a prior settlement offensively to conclusively establish the amount owed by the indemnitor under an express indemnity contract." (Mel Clayton Ford, supra, 104 Cal.App.4th at pp. 59-60, 127 Cal.Rptr.2d 759.)
The Mel Clayton Ford court went on to say that the trial court had treated Ford "worse than an insurer." (Mel Clayton Ford, supra, 104 Cal.App.4th at p. 54, 127 Cal.Rptr.2d 759, original italics). That is, by presuming that the settlement by the dealer established liability on the part of Ford, the trial court had treated Ford as an insurer under the rules announced in Isaacson v. California Ins. Guarantee Assn., supra, 44 Cal.3d 775, 244 Cal.Rptr. 655, 750 P.2d 297. Those rules had established a rebuttable presumption that a settlement by an insured, where the insurer has "wrongfully refused to cover or defend a claim," renders the insurer liable for the amount of the settlement. (See Mel Clayton Ford, supra, 104 Cal.App.4th at p. 55, 127 Cal.Rptr.2d 759, citing and quoting Isaacson, supra, 44 Cal.3d at pp. 791-794, 244 Cal.Rptr. 655, 750 P.2d 297.) In that regard, the Mel Clayton Ford court noted that even in the insurance context "it is by no means clear" that a wrongful refusal to defend will render an insurer liable for a good faith settlement negotiated by the insured in cases where "`there was in fact no coverage.'" (Mel Clayton Ford, supra, 104 Cal.App.4th at p. 57, fn. 4, 127 Cal.Rptr.2d 759, quoting Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶ 7:692.4, p. 7B-54, italics omitted.)
The point is: Despite dicta that, out of context, might be stretched for the proposition that negligence is a prerequisite to defense obligation under an indemnity contract, any dicta to that effect is still dicta. When you look at what Mel Clayton Ford actually held, it is Peter Culley redux  a case that stands for the perfectly sound proposition that good faith settlement law should not be used to create presumptions or obligations that otherwise do not exist in the indemnity and defense contracts. Our result today is by no means inconsistent with the actual holdings of either Mel Clayton Ford or Peter Culley: The case before us, unlike those two cases, is not about the misuse of the good faith settlement statute.

6. Baldwin Builders

As we write in the latter half of 2005, a case which merits a brief discussion is *830 Baldwin Builders v. Coast Plastering Corp., supra, 125 Cal.App.4th 1339, 1347, 24 Cal.Rptr.3d 9, though Baldwin Builders is primarily of interest because it read Heppler as merely standing for a "general" and not an absolute rule.
Here are the facts: In a construction defect case, two subs refused a request by the developer for a defense, but were still dragged into the case by way of the developer's cross-complaint for various kinds of indemnity, including express contractual indemnity. The jury found that the two subs were not negligent; in fact, it was the developer who was negligent.
The subs wanted their money back, but the indemnity contract between the subs and the developer was unilateral  any obligation to pay fees ran from the subs to the developer. So the subs sought a fee claim under the reciprocity principles of section 1717 of the Civil Code.
The court initially began by distinguishing between attorney fees owed as an "item of loss or expense" in the indemnity provision from attorney fees that could be recovered in the process of enforcing the indemnity provision itself. (See Baldwin Builders, supra, 125 Cal.App.4th at pp. 1344-1346, 24 Cal.Rptr.3d 9.) The former are not subject to section 1717, the latter are. (Id. at p. 1346, 24 Cal.Rptr.3d 9; cf. Building Maintenance Service Co. v. AIL Systems, Inc. (1997) 55 Cal.App.4th 1014, 1028-1032, 64 Cal.Rptr.2d 353 [because indemnity contract did not address actions between the parties on the contract itself, section 1717 did not apply].)
Even so, the court did not think that the two subs should have their recovery limited to just money spent to "enforce" (in that context, defend) the indemnity provision itself. The Baldwin Builders court also believed that fees spent "establishing their lack of liability for the alleged defects" could also be recovered.
To establish that point, the Baldwin Builders court first had recourse to what it said was a general rule recognized in Heppler: "As this court recognized in Heppler [cite], an indemnitor/subcontractor generally will not be liable or have a duty to defend its general contractor pursuant to the terms of an indemnity agreement unless it was negligent in performing its work under the subcontract." (Baldwin Builders, supra, 125 Cal.App.4th at p. 1347, 24 Cal.Rptr.3d 9.)
The point cite given is to page 1278 of Heppler, which, as we have shown in (probably too much) detail above, focused on the rule from Goldman that specific language is required before an indemnity contract will be interpreted to "apply regardless of the subcontractor's negligence." The Baldwin Builders court reasoned that because the two subs "were required to establish that they were not negligent in performing the work under their respective subcontracts in order to defeat Baldwin's express indemnity claim, the trial court could properly have included the fees and costs incurred in making that showing as an element of the fees and costs incurred to enforce the indemnity agreements." (Baldwin Builders, supra, 125 Cal.App.4th at p. 1348, 24 Cal.Rptr.3d 9.) Even so, it was also clear that not all of the two subs' fees had been incurred to establish their lack of liability for defects in the development, so the matter had to be remanded for further proceedings to identify those fees. (Ibid.)
Since the two subs in Baldwin Builders never actually defended the developer pursuant to the promise to defend found in their contracts with the developer,[42] the *831 court was not concerned with any fees they might have so spent, and the opinion mentions no claim by the developer that, despite the two subs' lack of negligence, they were still required to defend the developer. Thus Baldwin Builders certainly cannot be said to stand for a rule  whether general or not  that, despite plain contractual language to the contrary, the establishment of negligence is an absolute prerequisite before a subcontractor must defend an indemnitee. The court never considered the problem, or had need to.

D. Public Policy

1. What the Legislature Has Said

Now, let's ask this question: Are we and the trial court missing something? Might there be some public policy, expressed by the Legislature, against enforcing subcontractor agreements to defend?
The answer is no. In fact, under current law, the Legislature seems to have no problem with subcontractors obligating themselves to defend.
We can begin with what the Legislature has said by way of public policy: Generally speaking, non-insurance construction contracts by which the indemnitor promises to indemnify the indemnitee for expenses arising from the indemnitee's sole negligence are against public policy and thus unenforceable. (Civ.Code, § 2782, subd. (a), italics added.)[43]
We need not explore the ins and outs of section 2782 to recognize that, by its terms, it doesn't apply in a case like the one before us, where third party claimants are alleging negligence and strict liability against the indemnitor (the sub), and so the present case is well removed from the scenario where the indemnitee (the developer) is seeking indemnification for its "sole" negligence. Thus, even if the verb "to indemnify" in section 2782 might be read broadly to include defense "expense," the statute is not triggered.[44]
*832 Elsewhere in that small but dark eddy of the Civil Code governing indemnity (currently Civil Code sections 2772-2784.5), there is a statute, section 2778, which addresses defense duties no less than twice.
First, section 2778, subdivision 3, provides: "In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears: [¶] 3. An indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion."
This statute can, of course, be read in isolation as a simple reimbursement ("costs of defense") statute (an indemnitee is entitled to be reimbursed for money it has already spent on defense) or as contemplating a current duty to defend (by virtue of being the indemnitor, the indemnitor must pay costs of defense against claims).
However, the next subdivision shows that the Legislature has envisioned situations where an indemnitor will be providing a current defense. Section 2778, subdivision 4, says, in its entirety: "In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears: [¶] 4. The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity, but the person indemnified has the right to conduct such defenses, if he chooses to do so." (Italics added.) The time frame in this subdivision is unmistakable. It is written from the perspective of a party who requests a defense and who has, unless a contrary intention is otherwise expressed in the contract, the right to conduct that defense. But even if it is the indemnitee, rather than the indemnitor, who conducts a defense, the indemnitor's obligation is still a current obligation, "binding" on the request of the indemnitee at a time when the indemnitee can still "conduct" the defense.
Finally, if there is any doubt, subdivisions 5 and 6 are the clinchers. Section 2778, subdivision 5, which clearly dates the "request" for a defense and the concomitant obligation to defend at a time prior to any recovery suffered by the indemnitee: "If, after request, the person indemnifying neglects to defend the person indemnified, a recovery against the latter suffered by him in good faith, is conclusive in his favor against the former." (Italics added.) The point, the party has let an opportunity to afford a service (the defense) wrongfully slip by, and must therefore bear the consequences. By the same token, subdivision 6 refers to "reasonable notice" and control of the defense to the indemnitor, again indicating that the duty to defend, consistent with what our Supreme Court knew from the beginning in Gray, arises during the underlying litigation, i.e., at a time before the indemnitor's negligence has been established.
The point of this statutory excursion is simple: There is, as of the moment, no statutory or public policy reason that contravenes what the contract otherwise provides.
Now, perhaps there ought to be. But let the Legislature make that decision. It is in the best position to hear the views of all sectors of the construction industry, consumers and insurers, and decide whether contracts such as the one before us  that require defenses of claims, and thus necessarily impose an obligation that arises prior to an adjudication of negligence  should be enforceable. All we can say is that under current statutory law there is no public policy against the enforcement *833 of this contract. The statutes do not alleviate a subcontractor of an obligation to defend a general contractor that the subcontractor would otherwise have by express contract, or the even by the default terms of section 2778.

2. Practicalities

The Regan Roofing court observed, in passing, that a "fragmented duty to defend" might pose "practical problems for an immediate or current duty to defend (or to pay pro rata for another's defense) up to and including trial." (Regan Roofing, supra, 24 Cal.App.4th at p. 437, 29 Cal.Rptr.2d 413.)
We need only remark here that it appears the Regan Roofing court was primarily animated by what it perceived as a lack of clarity of the "exemplar" contract given the trial court. By itself, of course, that point is unremarkable. Surely Regan Roofing (despite the later distancing it received from both the Centex and Transamerica Ins. courts) is unassailable on the point that trial courts cannot be expected to lay down a rule for 24 different parties based on one "exemplar" contract that does not universally apply to all those parties.
Here, by contrast, we have clarity  the contract is structured so that parties agreed to a (limited, to be sure) defense obligation independent of the obligation to indemnify against a judgment or settlement. Thus none of the otherwise unexplained "practical problems" to which the Regan Roofing court otherwise alluded apply. We need only add that trial courts handling claims against multiple insurers regularly sort through the separate defense and indemnity obligations which those insurers may, or may not, have undertaken. (E.g., Aerojet-General Corp. v. Transport Indemnity Co. (1997) 17 Cal.4th 38, 70 Cal.Rptr.2d 118, 948 P.2d 909 [one extremely complex case for a trial court to manage].)[45]

3. Conscionability

Finally, we must formally recognize a theme which has been sounded in cases yielding results both favorable and unfavorable to subcontractor-indemnitors  conscionability. The theme has been sounded by the danger perceived by several courts that a "small-time subcontractor" will be saddled with "ruinous liability" if a defense obligation undertaken by that subcontractor is enforced. (See Continental Heller, supra, 53 Cal.App.4th at p. 507, 61 Cal.Rptr.2d 668.) That theme has been echoed in Heppler and Centex, which both emphasized the role of "commercial context" and "commercial reality" in their respective decisions.
We have noted in this opinion a number of interpretational safeguards which help protect subcontractors from ruinous liability: Such contracts are narrowly construed against the indemnitee, and both the scope and trigger of any defense obligation should be narrowly construed as well. We have also noted that indemnity contracts also typically require that the sub carry insurance, and that the sub put the general *834 or developer on that insurance contract. (After all, we may assume that developers would rather look to a sub's insurer for "defense and indemnity" than they would to subs themselves.)
Even so, it is not inconceivable that a theoretical case could arise where a "small-time subcontractor" might, indeed, find itself "saddled" with ruinous or potentially ruinous liability based on an obligation to defend.
As we have also seen, subcontractor-indemnity contracts are typically preprinted, form contracts which are also contracts of adhesion. And the worry is that, in some cases at least, such contracts might be, if drafted sufficiently well to withstand the interpretational safeguards noted above, so unfairly one-sided if they ended up making a ma and pa subcontractor responsible for megabuck attorney fees incurred by a developer defending a large construction defect case. To such a scenario let us simply declare that the elements of unconscionability might very well be found to be present (see Discover Bank v. Superior Court (2005) 36 Cal.4th 148, 160, 30 Cal.Rptr.3d 76, 113 P.3d 1100). Thus, this opinion in no wise should be read as in any way precluding a conscionability defense under different circumstances than those before us.
We can say, though, along with the court in Continental Heller, that there is nothing unconscionable about the risk allocation in the agreement before us. (See Continental Heller, supra, 53 Cal.App.4th at p. 507, 61 Cal.Rptr.2d 668.) This case involves a manufacturer which could have negotiated the terms of its defense and indemnity agreement with the developer. This case does not involve a small-time carpentry shop which is suddenly being asked to defend all the claims brought against a big developer in major construction defect litigation.
With that, enough said. We may leave for other courts and other days any development of an unconscionability doctrine in the context of subcontractor promises to defend claims.

V. ATTORNEY FEES AWARDED FOR PROSECUTING THE CROSS-COMPLAINT

A. Prevailing Party Issue
In addition to the declaration that the window manufacturer owed the developer half of the developer's defense costs attributable to alleged window problems, the trial court also awarded the developer some $47,000[46] pursuant to an attorney fee provision in the subcontract for prosecuting the cross-complaint. The window manufacturer claims that it, not the developer, was the prevailing party on the developer's cross-complaint.[47] The argument is based on the theory that the developer recovered only a "mere fraction" of what it sought from the window manufacturer  as the manufacturer put in its trial court opposition to the developer's fee request, the developer's recovery was but a pyrrhic victory.
Our Supreme Court observed in Scott Co. v. Blount, Inc. (1999) 20 Cal.4th 1103, 1106, 86 Cal.Rptr.2d 614, 979 P.2d 974 that a "party's entitlement to attorney fees in a *835 lawsuit based on a contract containing an attorney fees provision often depends not just upon the language of the contractual provision but also upon the complex interaction of several statutes that affect a party's contractual right to attorney fees...." Those statutes include section 1717 of the Civil Code and section 1032 of the Code of Civil Procedure. (They can also include section 998 of the Code of Civil Procedure, though, fortunately, there is no section 998 issue in the case before us as there was in Scott.)
Section 1032, as Scott teaches, "is the fundamental authority for awarding costs in civil actions" (Scott, supra, 20 Cal.4th at p. 1108, 86 Cal.Rptr.2d 614, 979 P.2d 974), establishing a general rule that except as expressly provided by statute, a "prevailing party" is entitled to its costs in any action (§ 1032, subd. (b)). A related statute, section 1033.5, subd. (a)(10)(A), makes attorney fees one such item of costs when such fees are authorized by contract. Section 1032 defines "prevailing party" as the party with "a net monetary recovery."
The primary purpose of section 1717, as pointed out in Santisas v. Goodin (1998) 17 Cal.4th 599, 610, 71 Cal.Rptr.2d 830, 951 P.2d 399, "is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." It operates in two "distinct situations." One is to make "an otherwise unilateral right reciprocal." (Ibid.) The other is when a person sued on a contract with an attorney fee provision defends by successfully arguing that the contract is inapplicable, invalid, unenforceable or non-existent. (Id. at p. 611, 71 Cal.Rptr.2d 830, 951 P.2d 399). Section 1717, however, has a trigger for prevailing party that is defined differently than section 1032. Under section 1717, subdivision (b)(1) the "party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract." (Italics added.)
The relationship between section 1032 and section 1717 is not altogether clear on the face of either statute. In fact, their relationship has been the subject of some complex judicial analysis, most particularly in Santisas, supra, 17 Cal.4th 599, 71 Cal.Rptr.2d 830, 951 P.2d 399 and in Sears v. Baccaglio (1998) 60 Cal.App.4th 1136, 70 Cal.Rptr.2d 769. That complexity is shown not only in the majority, but in the concurring and dissenting opinions in both cases.[48]
The good news for us, though, is that we are spared the need to explore the intricacies of when, or maybe when not, either statute applies. In this case, the trial court's decision must be upheld regardless of whether either or both statutes were to control.
The easy statute is section 1032. If section 1032 were all we had to worry about, the window manufacturer would not even have a colorable argument on the prevailing party issue. Clearly, on its cross-complaint, the developer was the party with "a net monetary recovery." (And, for that matter, the window manufacturer *836 was a party with a net monetary loss.) $131,000 beats zero any day.
Section 1717 is a bit more problematic. The window manufacturer here relies on the paradigm articulated in Hsu v. Abbara (1995) 9 Cal.4th 863, 876, 39 Cal.Rptr.2d 824, 891 P.2d 804, which indicates that there must be comparison of what was sought with what was gained: The trial court should "compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings...." And that determination is made "only upon final resolution of the contract claims and only by `a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions.'" (Ibid.)
One can easily tell where the window manufacturer is going with this argument: Because the developer potentially sought about $1 million on its cross-complaint for indemnity, and obtained only about $131,000, the developer did not, in substance, prevail.
Not so. The Hsu paradigm of section 1717 cannot be considered in a vacuum, as the developer would have us. On it rests an overlay of trial court discretion as explicated in Sears, Scott, and (most recently) Jackson v. Homeowners Assn. Monte Vista Estates-East (2001) 93 Cal.App.4th 773, 113 Cal.Rptr.2d 363.
Sears is a tour de force on the subject of the trial court's discretion to choose the prevailing party as an "equitable" matter. Indeed, the opinion is peppered with the word "equitable." (E.g., Sears, supra, 60 Cal.App.4th at pp. 1147-1148, 70 Cal.Rptr.2d 769 ["Thus, the continuing theme of the Legislature's discussion of section 1717 has been the avoidance of narrowly defined procedures, which have been seen as favoring the dominant party, in favor of an equitable consideration of who should fairly be regarded as the winner."].) Scott and Jackson (and also Hsu) help us map what is within, and without, the boundaries of trial court discretion.
The facts in Hsu represent one extreme. In a house sale dispute where the sellers obtained a "`simple unqualified win'" (Hsu, supra, 9 Cal.4th at p. 876, 39 Cal.Rptr.2d 824, 891 P.2d 804) on the "only contract claim between them," there was no discretion to do anything but award the sellers their fees, because "no substantial evidence" would support a contrary finding. (Ibid.)
Scott and Jackson, however, demonstrate that the trial court's discretion to choose the true winner (or no winner at all) is quite broad in mixed result cases. (See, Jackson, supra, 93 Cal.App.4th at p. 788, 113 Cal.Rptr.2d 363 [no "clear win" by either side].) In Jackson, the owners of a unit in a senior citizen community sought to invalidate deed restrictions which purported to restrict ownership in the community "to persons age 55 and older who live on the property." (Id. at p. 777, 113 Cal.Rptr.2d 363.) The trial court found the deed restrictions valid and enforceable, and ruled that the unit owners were to "take nothing" from the defendant homeowners' association and were not entitled to "any relief or damages." (Ibid.) On appeal, however, the judgment was modified to make it clear that only one of the residents of each home needed to be at least 55 years old. (Ibid.) After the appeal, the trial court determined that the plaintiff unit owners were the prevailing parties and ordered a fee payment under section 1717, despite the fact that the unit owners were taking nothing.
The fee order was affirmed by the appellate court, noting that "substantial arguments" supported both sides' claims to be the prevailing party. (Jackson, supra, *837 93 Cal.App.4th at p. 788, 113 Cal.Rptr.2d 363.) The modification obtained at the appellate level had at least allowed the unit owners to rent the property. (See ibid.) And given the discretionary standard of review and the mixed result, the issue fell "within the trial court's broad equitable discretion" and, on that point, no abuse of discretion had been shown. (Ibid.)
Scott is equally dramatic in illustrating the scope of the trial court's discretion under section 1717 to determine the true prevailing party. (In Scott, the fee provision was unilateral, so there was no doubt (and no dissenting opinions) about the operation of section 1717.) In Scott, a subcontractor contended that the general contractor's incompetent management of a job had cost the sub money. At one point in the litigation, the plaintiff sought damages for $2 million, but succeeded in obtaining only a little more than a fifth of that, about $440,000. Even so, the trial court determined it was the prevailing party under section 1717, and that determination was upheld under an abuse of discretion standard.
First, the Scott court made it quite clear that the discretion standard applies to prevailing party determinations under section 1717 when results are mixed. "If neither party achieves a complete victory on all the contract claims, it is within the discretion of the trial court to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees." (Scott, supra, 20 Cal.4th at p. 1109, 86 Cal.Rptr.2d 614, 979 P.2d 974.) And then it observed that there was no abuse given the facts before it: "At trial in this case, plaintiff sought to prove more than $2 million in damages; it succeeded in establishing only about $440,000 in damages. Although plaintiff here did not achieve all of its litigation objectives, and thus is not automatically a party prevailing on the contract for purposes of section 1717, the trial court did not abuse its discretion in implicitly concluding that on balance plaintiff prevailed on the contract for purposes of section 1717." (Ibid.)
In light of the discretionary standard so clearly set forth in Sears and later in Scott, and in light of the actual facts in both Jackson and Scott, we cannot say that the trial court abused its discretion in determining that the developer was the prevailing party on the developer's action (cross-complaint) against the window manufacturer here. Substantial evidence clearly supports the trial court's decision.
For one thing, there is no doubt that the developer was the party with a net monetary recovery. Even though monetary recovery is the test under section 1032, it is also at least a factor bearing on the section 1717 analysis. (See Sears, supra, 60 Cal.App.4th at p. 1156, 70 Cal.Rptr.2d 769 ["An analysis under section 1717's equitable purview would almost certainly include consideration of the factors enumerated by section 1032...."].) For another, as Scott shows, inflated expectations of recoveries must be tempered by context. In Scott, there was about a $1.6 million gap between what the plaintiff initially sought and what the plaintiff ultimately gained. Here, the gap is less, though the ratio higher. Nevertheless, it cannot be denied that $131,000 is a substantial recovery, not a nominal one. Moreover, in Jackson, just a small alteration in the wording of a judgment  granted, it allowed property to be rented where a totally literal reading previously had precluded rentals  in an otherwise total loss for the plaintiffs was enough to uphold the determination under section 1717. The win in Jackson seems no greater than the developer's win of defense costs here. The win in Sears seems qualitatively similar to it.
*838 Finally, there is the fact that defense fees are often a singular bone of contention in indemnity (including insurance) contexts, i.e., they are often more important than the formal indemnity obligation, as the leading duty-to-defend cases involving pollution liability in the insurance context show (e.g., Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878 [continuous trigger meant duty to defend]; Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th 38, 70 Cal.Rptr.2d 118, 948 P.2d 909 [battle over whether site investigation expenses could constitute defense costs under potentiality rule for defense costs; answer: yes].) That fact is borne out in this very opinion, where the issue of the window manufacturer's obligation to pay defense costs has occupied the greater part of the discussion.

B. The Duplication Issue
The window manufacturer further argues that the $47,000 that was awarded the developer for prosecuting the cross-complaint was included within the $131,000 in fees that the trial court declared that the window manufacturer owes on the cross-complaint. The point was not raised in the trial court, and since it goes to the trial court's discretion on the amount-of-fee issue at the time (hardly a question of law), it is waived. (See Children's Hospital & Medical Center v. Bonta (2002) 97 Cal.App.4th 740, 776, 118 Cal.Rptr.2d 629 [appellant waived asserted error in award of attorney fees by failing to raise its objection in the trial court].)

C. The Allocation Issue
The window manufacturer also asserts that the trial court erred by allocating to the window manufacturer costs that are more justly allocated to the window framer. The window framer, after all, was the party that the jury thought was negligent.
This contention re-raises the chicken-egg conundrum inherent in the defense obligation. As we have shown (and common sense will admit no other answer) an obligation to "defend" is current  otherwise it is merely a condition subsequent for a duty to reimburse. Now, if one takes seriously the idea of a duty to defend arising at a time when a request is made for it (i.e., at a time when there is still a suit to defend against), then it follows that both the window manufacturer and the window framer had equal duties to defend a suit founded on claims growing out their work (negligent or not). And from that it follows that splitting the 70 percent of defense costs allocable to window problems was eminently reasonable.

VI. DISPOSITION
The new trial order is affirmed. Those parts of the judgment challenged in this appeal by the window manufacturer are affirmed. The respondents' cross-appeals are dismissed as moot. The developer will recover its costs on appeal.
I CONCUR: ARONSON, J.
O'LEARY, J., Concurring and Dissenting.
I concur with the majority insofar as the trial court's order granting a partial new trial is affirmed. I respectfully dissent, however, from the balance of the opinion and its reasoning.
My legal interpretation of the express indemnity agreement differs from that of my colleagues. "Where, as here, the parties have expressly contracted with respect to the duty to indemnify, the extent of that duty must be determined from the contract...." (Rossmoor Sanitation, Inc. v. Pylon, Inc. (1975) 13 Cal.3d 622, 628, 119 *839 Cal.Rptr. 449, 532 P.2d 97 (Rossmoor).) "[T]he question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. When the parties knowingly bargain for the protection at issue, the protection should be afforded. This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts." (Id. at p. 633, 119 Cal.Rptr. 449, 532 P.2d 97, italics added.) Consistent with the majority's assessment of the many cases endeavoring to interpret indemnity contracts, we found no authority suggesting any "per se" rule. (See ante, at pp. 791-792.) For the past 20 years courts have "eschewed a `mechanical application'" of any rigid rules when analyzing subcontracts. (Heppler v. J.M. Peters Co. (1999) 73 Cal.App.4th 1265, 1276, 87 Cal.Rptr.2d 497 (Heppler).)
The trial court interpreted the subcontract at issue as follows: Fault (negligence plus causation) by the subcontractor was a prerequisite to indemnity for damages, but fault was not required to trigger a duty to pay defense costs. Therefore, after the jury determined the window subcontractor (Weather Shield Manufacturing Inc.) was not negligent, the court denied the indemnity claim for damages but granted the developer's reimbursement claim for the costs required to defend the subcontractor's work. "Because the trial court construed the indemnity provisions here without the aid of extrinsic evidence, the interpretation of the provisions is a question of law for this court. [Citation.]" (Heppler, supra, 73 Cal.App.4th at p. 1275, 87 Cal.Rptr.2d 497.)
While courts use general rules of contract interpretation to determine the parties' intent, "In indemnity contracts ... the provisions of [Civil Code] section 2778[1] prescribing the rules for interpreting indemnity agreements, are as much a part of such instrument as those set out therein, unless a contrary intention appears. [Citations.]" (Gribaldo, Jacobs, Jones Associates v. Agrippina, Versicherunges A.G. (1970) 3 Cal.3d 434, 442, 91 Cal.Rptr. 6, 476 P.2d 406, fn. omitted, italics added.)
Therefore, the starting point for my analysis of the indemnity provisions is the Civil Code. Section 2778 begins by stating, "In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears[.]" Subdivisions 1 and 2, of section 2778, delineate the two classes of indemnity contracts generally. One class concerns indemnification from liability (§ 2778, subd. (1)), and the other engages to save the indemnitee from actual loss (§ 2778, subd. (2)).
Subdivision 3 provides a broadly-worded rule of construction: "An indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion[.]" (Italics added.) In other words, when interpreting a contract, the term "indemnity" should be construed as being more than just another word for damages. Rather, it conveys the entire "obligation resting on one party to make good a loss or damage another party has incurred." (Rossmoor, supra, 13 Cal.3d at p. 628, 119 Cal.Rptr. 449, 532 P.2d 97, italics added.)
As noted by the majority, when applying subdivision 3, there is no designated timeframe for payment of defense costs. The *840 obligation to indemnify these costs could be triggered before or after the bills have been paid. (See ante, at p. 832.)
Section 2778, subdivision 4, discusses the mechanism used to trigger the duty to defend. It provides, "The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity, but the person indemnified has the right to conduct such defenses, if he chooses to do so[.]" (Italics added.)[2]
The majority reads this subdivision as showing the Legislature "envisioned situations where an indemnitor will be providing a current defense." (ante, at p. 832, original italics.) "The time frame in this subdivision is unmistakable." (Id. at p. 832.) "A defense obligation is of necessity a current obligation." (Id. at p. 806-807.)
I do not find this subdivision lends any support for the new rule proposed by the majority for interpreting duty to defend contract provisions. The mechanism to trigger this indemnity obligation has two components. First, is the simple requirement of a "request." (2778, subd. (4).) There is no language mandating when this request should be made. The second component requires the request to concern an action involving "matters embraced by the indemnity[.]" (Ibid.) The latter component obviously requires an inquiry into both the circumstances of the claim at issue, and the scope of indemnity protection agreed upon in the contract. And although the word "defend," as defined in the abstract, would ordinarily mean providing legal services for a pending claim, the parties were free to define the contract terms as they saw fit. "[E]ach case will turn on its own facts[]" (Rossmoor, supra, 13 Cal.3d at p. 633, 119 Cal.Rptr. 449, 532 P.2d 97), and for this reason the Legislature would not presume to mandate any particular timeframe for payment of defense costs.
It is the contracting parties, not subdivision 4, of section 2778 that defines the scope of coverage (i.e., the matters embraced by the indemnity) in any given case. It is well settled, "[The] parties to an indemnity contract have great freedom of action in allocating risk.... [Citation.]" (Heppler, supra, 73 Cal.App.4th at p. 1277, 87 Cal.Rptr.2d 497.) For example, the parties may require "negligence by the indemnitor as a condition to indemnification [citation], or they may establish a duty in the indemnitor to save the indemnitee harmless even if the indemnitor is not negligent [citation]." (Ibid.) And, I found no case, and the majority cites to none, holding duty to defend language can never be interpreted as providing protection through retroactive payment.
Of course, in the context of a typical insurance indemnity contract, "the insurer's duty to defend runs to claims that are merely potentially covered ... [and] arises as soon as tender is made." (Buss v. Superior Court (1997) 16 Cal.4th 35, 46, 65 Cal.Rptr.2d 366, 939 P.2d 766 (Buss), italics added.) "This obligation is express in the policy's language. It rests on the fact that the insurer has been paid premiums by the insured for a defense." (Id. at p. 47, 65 Cal.Rptr.2d 366, 939 P.2d 766.) "It bargained to bear these costs." (Id. at p. 49, 65 Cal.Rptr.2d 366, 939 P.2d 766.) "Conversely, in an action wherein none of the claims is even potentially covered, the insurer does not have a duty to defend. [Citations.] This freedom is implied in the *841 policy's language. It rests on the fact that the insurer has not been paid premiums by the insured for a defense." (Id. at p. 47, 65 Cal.Rptr.2d 366, 939 P.2d 766.) Although "[an] insurer's duty to defend is broader than its duty to indemnify[,]" the duty is not unlimited, and both obligations are dependent on the coverage terms articulated in the policy. (Id. at pp. 46-47, 65 Cal.Rptr.2d 366, 939 P.2d 766 [duty to defend is not independent of the duty to indemnify].)[3] And, "To yield their meaning, the provisions of a policy must be considered in their full context. [Citations.] Where it is clear, the language must be read accordingly. [Citations.] Where it is not, it must be read in conformity with what the insurer believed the insured understood thereby at the time of formation [citations] and, if it remains problematic, in the sense that satisfies the insured's objectively reasonable expectations [citations]." (Id. at p. 45, 65 Cal.Rptr.2d 366, 939 P.2d 766.)
As discussed at length by the majority, different presumptions apply when interpreting a subcontractor's indemnity contract. (ante, at pp. 804-805.) Where insurance contracts are broadly construed in favor of coverage, a subcontract is narrowly construed against the indemnitee (i.e., the developer) to limit coverage. This principle of interpretation rests on the fact subcontractors are ordinarily in a weaker bargaining position and they are not paid premiums by developers. It must be ascertained what the subcontractor knowingly bargained for when the agreement was made, which often requires consideration of the kind of work and size of project involved, i.e., the commercial context of the case.
Consequently, unlike insurance contracts, an expansive indemnity obligation in a subcontract must be articulated with "specific, unequivocal contractual language to that effect." (Heppler, supra, 73 Cal.App.4th at p. 1278, 87 Cal.Rptr.2d 497; see Continental Heller Corp. v. Amtech Mechanical Services, Inc. (1997) 53 Cal.App.4th 500, 504-505, 61 Cal.Rptr.2d 668 (Continental Heller) [agreement explicitly specified no-fault indemnity].) "[T]he specificity of the language used is a key factor in construction of an indemnity agreement. `[T]o obtain greater indemnity, more specific language must be used.' [Citation.]" (Heppler, supra, 73 Cal.App.4th at p. 1278, 87 Cal.Rptr.2d 497.)
The Continental Heller case provides one example of a subcontract containing an express no-fault indemnity provision. The agreement required "Amtech to indemnify Continental for a loss which `arises out of or is in any way connected with the performance of work under this Subcontract.' The contract further provide[d] Amtech's liability for indemnity `shall apply to any acts or omissions, willful misconduct or negligent conduct, whether active or passive, on the part of Subcontractor.'" (Continental Heller, supra, 53 Cal.App.4th at pp. 504-505, 61 Cal.Rptr.2d 668, fn. omitted.) Thus, Amtech knowingly agreed to indemnify "any acts or omissions" not just claims arising from its "willful misconduct or negligent conduct[.]" (Ibid.) The court in Continental Heller noted this risk *842 allocation was "commercially reasonable" given the lawsuit did not concern any small subcontractors working together on the same project. Amtech was a large company hired to install the entire refrigeration system for a meat packing plant. (Id. at pp. 506-507, 61 Cal.Rptr.2d 668.) Moreover, Amtech was in a better position to protect against loss as "it was Amtech, not Continental, which selected and installed the particular valve which subsequently failed...." (Id. at p. 506, 61 Cal.Rptr.2d 668; see also Goldman v. Ecco-Phoenix Elec. Corp. (1964) 62 Cal.2d 40, 46, 41 Cal.Rptr. 73, 396 P.2d 377 (Goldman) [no fault duty to defend by the following specific language, "`The Contractor shall assume the defense of ... all claims ... of every kind ... directly or indirectly arising from the performance of the contract or work, regardless of responsibility for negligence[ ]'" (Italics added)].)
Here, the duty to indemnify for damages, and the duty to defend, are described in a single sentence. The first clause of the sentence concerns the duty to indemnify for damages and provides the subcontractor "does agree to indemnify and save [o]wner harmless against all claims for damages ... growing out of the execution of the work...." Everyone (the litigants, trial court, and majority) seems to agree matters embraced by this indemnity clause are narrowly limited to damages caused by the subcontractor's own negligent work on the project.
The second clause of the same sentence concerns the duty to defend. There the subcontractor agreed "at his own expense to defend any suit or action brought against [o]wner founded upon the claim of such damage...." The qualifying phrase, "claim of such damage" clearly refers to the earlier language limiting the scope of claims embraced by the indemnity, i.e., "all claims for damages ... growing out of the execution of the work[.]" Therefore, both obligations appear to be dependent on the same coverage terms.
A different conclusion could be reached if the parties had included specific language elsewhere in the contract to qualify the phrase "claim of such damage." But I found nothing to indicate the parties mutually agreed the defense obligation would be broader than the duty to indemnify. Nor is there evidence tending to suggest the duty to defend was totally unrelated to the duty to indemnify. Certainly, the parties were free to include language expressly stating the duty to defend would apply immediately and "regardless of responsibility for negligence[.]" (Cf. Goldman, supra, 62 Cal.2d at p. 46, 41 Cal.Rptr. 73, 396 P.2d 377.) But in light of undisputed authority subcontracts must be narrowly construed, I conclude the parties intended the duty to defend obligation would be triggered only after it had been determined the defense costs related to a damage claim arising out of the subcontractor's negligent work.
We are not the first court to have considered the meaning of these particular indemnity provisions because this language can be found in many of the preprinted subcontracts often used in the construction industry. The Heppler case concerned identical indemnity provisions, binding several subcontractors, working in the same commercial context as ours. (Heppler, supra, 73 Cal.App.4th at pp. 1272-1273, 87 Cal.Rptr.2d 497.) The court in Heppler narrowly construed the indemnity provisions and concluded the non-negligent subcontractors had neither a duty to indemnify for damages nor a duty to pay defense costs. I find the court's analysis persuasive and adopt its sound legal reasoning.
As in this case, Heppler involved a construction defect lawsuit involving a large *843 residential development. (Heppler, supra, 73 Cal.App.4th at p. 1271, 87 Cal.Rptr.2d 497.) In Heppler, the developer's cross-complaint sought indemnity from several subcontractors and was based on two different preprinted contracts, each version containing differently worded indemnity provisions. (Id. at pp. 1272-1273, 87 Cal.Rptr.2d 497.) One version applied to the subcontractors hired to perform grading and landscaping. The other bound the subcontractors hired to supply roofs and concrete foundations. Relevant to our case, the latter version contained the exact same single sentence description of both indemnity obligations that was used in our case. (Id. at p. 1278, 87 Cal.Rptr.2d 497.)
The Heppler court did not find it necessary to separately discuss the language delineating the obligation to defend and the obligation to indemnify for damages. Nor did it highlight any distinctions between the different language found in the two subcontracts at issue. It found no need to do so based on its conclusion neither version contained language evidencing "a mutual understanding of the parties that the subcontractor would indemnify [and pay both damages and defense costs] ... even if its work was not negligent." (Heppler, supra, 73 Cal.App.4th at p. 1278, 87 Cal.Rptr.2d 497.) The key factor was the perceived absence of specific unequivocal language necessary for such expansive and insurance-like protection.
The Heppler court reasoned, "[H]ad the parties intended to include an indemnity provision that would apply regardless of the subcontractor's negligence, they would have had to use specific, unequivocal contractual language to that effect. [Citations.]" (Heppler, supra, 73 Cal.App.4th. at p. 1278, 87 Cal.Rptr.2d 497.) Moreover, the court noted the commercial context of "mass-produced residences" involving many subcontractors, each "performing a limited scope of work," would not support an "expansive indemnity obligation[ ] [a]bsent specific contractual language[.]" (Ibid.) And finally, the court determined the language was insufficient to trigger no-fault indemnity especially in light of "public policy considerations and decisional law, which impose vastly different responsibility on a developer versus a subcontractor." (Id. at pp. 1278-1279, 87 Cal.Rptr.2d 497.)[4]
Obviously, I do not share the majority's disapproval of the Heppler opinion. I can find no legal basis to ignore its precedential value. Based on the large body of statutory and case authority (including Heppler), I am convinced the award in this case of contractual attorney fees against the non-negligent subcontractor (Weather Shield Manufacturing Inc.) should be reversed. Accordingly, I believe it would also be necessary to remand the issue of fees and costs awarded to the developer as the prevailing party to the trial court for reconsideration.
I will mercifully refrain from a point by point response to the balance of the rather lengthy majority opinion, but some minimal response is necessary. Based on my *844 reading of the majority opinion, it appears the majority has construed the subcontractor's agreement to pay defense costs against the subcontractor in favor of coverage. They reach this result by construing the contract's reference to "claims of such damage" as not being related to the same coverage embraced by indemnity. The majority reasons the phrase merely serves to acknowledge the subcontractor need not pay for defense costs concerning the work of other subcontractors. I have already set forth my analysis of the statutory rules and case authority and so there is no need to belabor the reasons for our differences of opinion.
I am, however, concerned that a new rule has emerged from the majority's lengthy discussion of the word "defend."[5] (See ante, at pp. 805-809, 813-816, 831-835.) The majority has proclaimed, "A defense obligation is of necessity a current obligation." (Id. at pp. 806-807.) It is their view that when a party contracts "to defend," reimbursement of defense costs will never satisfy the obligation. The majority would require parties to expressly state the subcontractor is assuming a duty "to reimburse" money spent to defend the action. As a practical matter, the new rule would require trial courts to sort out the portion each subcontractor must pay towards defense costs before they are incurred. Because in this case the parties agreed to have the court decide the duty to defend issue after the jury's verdict, the majority's protracted discussion as to when the money must be paid is unnecessary. I believe our discussion should be limited to a de novo interpretation of the indemnity provisions and no more.
Although the timing issue is extraneous in this case, the majority's edict a defense obligation is always immediate will have far reaching consequences for the construction industry. In addition to burdening the trial courts with complicated pretrial issues, it is likely subcontractors will be forced to provide a current defense for claims that are only potentially covered (just like an insurer). It is unreasonable to require a trial court (or developer or subcontractor) to accurately predict, before a complex construction defect case is tried, the exact portion of defense needed from dozens of subcontractors to cover the portion of each claim founded on each subcontractor's work. Not all construction defect damages are easily attributable to one or two subcontractors, particularly when the project involves the mass production of homes. Applying the majority's analysis, the subcontractor is bound to provide a defense as long as there is merely a preliminary indication the claim is founded on the subcontractor's own work. Consequently, there will always be the foreseeable risk the subcontractor will end up paying a portion (or all) of the defense costs for damages ultimately found not to be based on its work.
There is one case that discusses, albeit in a different context, the practical problems that could arise from a rigid rule mandating an immediate defense obligation. Regan Roofing Co. v. Superior Court (1994) 24 Cal.App.4th 425, 29 Cal.Rptr.2d 413 (Regan Roofing), is a construction defect case involving mass-produced residences. The developer's indemnity contract with over 20 subcontractors was equivalent to the one in our case. (Id. at p. 430, 29 Cal.Rptr.2d 413.) The Regan Roofing court rejected the developer's pretrial effort (via a motion for summary adjudication) to establish the subcontractors *845 had a current obligation to provide the developer's defense. It concluded the developer was seeking "to have a series of related defenses provided. While such a fragmented duty to defend poses no particular problems with regard to any ultimate division of the costs of defense, as part of the indemnification duty, it does pose practical problems for an immediate or current duty to defend (or to pay pro rata for another's defense) up to and including trial." (Id. at p. 437, 29 Cal.Rptr.2d 413.)[6] I am deeply concerned more problems will be created, than solved, by the majority's new rule.
NOTES
[1] Since we affirm the trial court's grant of new trial, we hereby dismiss the protective cross-appeals filed by both sets of plaintiff homeowners as moot.
[2] "Contractor does agree to indemnify and save Owner harmless against all claims for damages to persons or to property and claims for loss, damage and/or theft of homeowner's personal property growing out of the execution of the work, and at his own expense to defend any suit or action brought against Owner founded upon the claim of such damage or loss or theft; to procure and maintain, during the entire progress of the work, full and unlimited Workman's Compensation and Employers' Liability Insurance, Public Liability and Property Damage Insurance including without limitation automobile and products liability covering in amounts and with a carrier or carriers satisfactory to Owner; to furnish Owner with certificates of said insurance before commencing work hereunder which certificates shall provide that the policy shall not be canceled or reduced in coverage until ten (10) days after written notice shall be given to Owner of such cancellation or reduction in coverage; to insure his interest from loss to the premises resulting from fire, earth settlement, earthquake, theft, embezzlement, riot or any other cause whatsoever and Owner shall not, under any circumstances, be liable or accountable to the Contractor for such loss."
[3] See Rapattoni, Subcontractors Seek Shield From Full Liability, L.A. Daily Journal (April 27, 2005), p. 1 [noting that bills have been introduced in Legislature "to ban contract clauses that require subcontractors to indemnify or provide a defense for developers who are sued for construction defects."]
[4] The comedy troupe Monty Python once made the subject of insurance  insurance of all things  the butt of a comedy skit. But we doubt that even comedians of their caliber would try to make "indemnity" the topic of comedy. It is a topic so deadly dull that it makes insurance look interesting. That is not to say, however, that the topic is not of vital importance in many commercial contexts, particularly in California's construction industry.
[5] All references to section 1717 or to section 2772 or 2778 in this opinion will be to the Civil Code. All references to sections 1032 or 1033.5 will be to the Code of Civil Procedure.
[6] Namely, Capital Pacific Holdings, Inc., fdba J.M. Peters Company, Inc., whom we will refer for reader convenience under the generic title of "the developer."
[7] Defendant Weather Shield Mfg. Inc., who will be referred to as "the window manufacturer."
[8] Darrow the Framing Corporation, who will be referred to as "the window framer."
[9] Some published decisions, because the distinction between indemnity and defense was not specifically before the court, have tended to lump the duty to defend with the duty to indemnify and will frequently refer to the two distinct obligations as "indemnity provisions." Because the distinction is the focus of much of this opinion, we will go out of our way to emphasize the separateness of the two obligations.
[10] The trial judge would later interlineate into the judgment the recitation that "By stipulation of the parties, the causes of action in [the developer's] cross-complaint for declaratory relief were bifurcated for trial by the court after the jury returned a verdict on the other causes."
[11] The factors are: (1) the state of the evidence; (2) the effect of other instructions; (3) the effect of counsel's arguments; and (4) any indications by the jury itself that it was misled. (See Soule, supra, 8 Cal.4th at pp. 580-581, 34 Cal.Rptr.2d 607, 882 P.2d 298.)
[12] To the degree that the window manufacturer challenged that order on any other basis than the proposition that the developer was not the prevailing party, the issue has not been raised in the opening brief and is thus waived in this appeal.
[13] The supposed "cross-appellant's reply brief" of one group of homeowners, known in this case as the "Alai" plaintiffs, is devoted exclusively to the merits of the window manufacturer's appeal on the new trial order. Accordingly, we grant the window manufacturer's motion to strike that brief.
[14] Here is the text covering the chart maker's argument: "Respondent additionally urges that the substance of the strict liability doctrine was adequately covered by the implied warranty instructions actually given. Thus it argues, `the Jeppesen Approach Chart could not have been "fit for the ordinary purposes for which such goods are used" under implied warranty theory, unless it would also "perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner" under the theory of strict products liability.'" (Fluor, supra, 170 Cal.App.3d at p. 478, 216 Cal.Rptr. 68.)
[15] In that regard there is, of course, no merit to the window manufacturer's argument that a trial judge, in deciding a new trial motion, must accord to the jury's verdict the benefit of all conflicts and inferences. The argument, in effect, turns a trial judge deciding a new trial motion into the functional equivalent of an appellate court reviewing a judgment  a transformation which is wholly inconsistent with the established abuse of discretion standard of review that governs new trial orders.
[16] In the case before us, it appears the window manufacturer's position is that the only way the jury could have found the manufacturer not negligent was to conclude that its windows were not defective. (See Combined Appellant's Reply Brief and Cross-Respondent's Brief at p. 17 ["If the jury believed the windows were so poorly designed and manufactured that they leaked and fogged to the extent that plaintiffs allege, how could the jury possibly conclude it was not a violation of the standard of care for a window manufacturer to distribute them?"].) But the focus on the manufacturer's reasonableness in a negligence context where the jury could "shift blame" to another defendant might very well prompt the jury to exonerate the manufacturer without ever asking whether the product itself was defective.
[17] One of the window manufacturer's arguments merits only this footnote. It is the idea that somehow the developer made a judicial concession when its counsel appeared to acknowledge in the context of its claim for indemnity that it could not prevail without a finding of negligence. The argument is not prevailing here for several reasons. First, the concession only applied to the developer's claim to get some of its settlement money back (that is, a classic indemnity claim sans defense obligation), not its quest for attorney fees in defending the underlying suits by the homeowners. Second, in context, counsel was merely acknowledging that the Heppler case would preclude classic indemnity without a threshold finding of negligence, and if Heppler stands for anything, it surely stands for that. (We will explain Heppler in greater detail in part IV.C.4. of this opinion.) Moreover, the bifurcation of the developer's claim for defense fees was pursuant to stipulation, and we find the window manufacturer's current appellate attempts to distance itself from that stipulation to be unavailing. Finally, as we are about to show, the developer's attorney fee claim involved a question of pure contractual and legal interpretation, so it was perfectly suited for adjudication by the trial court.
[18] Pardee Construction Co. v. Insurance Co. of the West (2000) 77 Cal.App.4th 1340, 92 Cal.Rptr.2d 443 is an example of how subcontractors' insurers can end up defending general contractors and developers by virtue of additional insured endorsements. Pardee Construction held that a group of insurers of subs had a duty to defend a general in a construction defect lawsuit where the owners alleged "numerous construction defects" including "defects relating to" the work of the various subs. (See id. at p. 1348, 92 Cal.Rptr.2d 443.) Most of the opinion was devoted to demonstrating that the insurers were obligated to defend despite the fact that the work had been completed prior to the inception of the policies. (The policies had "completed operations" coverage.) But in a passage noting the commercial context of general requirement that subs put generals on their CGL policies, the court had this insight: "Damage resulting from a subcontractor's work often does not arise for years. It is thus prudent for general contractors to obtain completed operations coverage as additional insureds from their subcontractors' insurers. Why would [the general] have required its subcontractors to maintain CGL coverage that included completed operations coverage and to name it as an additional insured on those policies unless it expected to be covered for the same completed operations as its subcontractors? Certainly that expectation is reasonable given that the additional insured coverage is intended by the insurance industry to cover vicarious liability that an additional insured may incur due to operations of the originally named insured." (Id. at pp. 1360-1361, 92 Cal.Rptr.2d 443; see also Maryland Casualty Co. v. Nationwide Ins. Co. (1998) 65 Cal.App.4th 21, 27, 76 Cal.Rptr.2d 113 (Maryland v. Nationwide I) [subs' insurers had obligation to defend general named as additional insured]; Presley Homes, Inc. v. American States Ins. Co. (2001) 90 Cal.App.4th 571, 577, 108 Cal.Rptr.2d 686.)
[19] Royal Surplus Lines Ins. Co. v. Ranger Ins. Co. (2002) 100 Cal.App.4th 193, 122 Cal.Rptr.2d 459, is an example of how a general contractor (there, actually, the owner itself) may seek recovery from both the sub's insurer on the basis of an additional insured endorsement, and the sub itself on the basis of the contractual defense and indemnity agreement. In Royal Surplus, an apartment owner entered into a contract with a framing sub, which included the framing sub's promise to add the owner onto its insurance policy, and the sub's own promise to defend and indemnify the owner for claims arising out of the sub's work. When the owner was sued by tenants for injuries sustained during construction, the owner sued both the sub and the sub's insurer. (The sub had lived up to its promise to obtain an additional insured endorsement for the owner.) The sub's insurer tried to get out of the case on demurrer on the theory that it is misjoinder to sue both an insured and an insurer, but, of course, that theory did not prevail in light of the independent obligations which ran from the sub's insurer (via the additional insured endorsement) and the sub itself (via its own defense and indemnity agreement) to the owner. (See also Beck, Ethical Issues in Joint Representation Under Subcontract Requirements for Defense and Additional Insured Status (1995) 15-Jan Construction Law. 25, 25 ["Subcontracts commonly include risk-shifting provisions that 1) require the subcontractor to defend and indemnify the general contractor for claims arising from the subcontractor's work, and 2) require that the subcontractor add the general contractor as an additional insured to the subcontractor's CGL policy."].)
[20] There is always the sense in these complex construction defect indemnity cases that they represent epic struggles between insurers, standing just off to the sidelines, out of camera range. Thus in Goldman v. Ecco-Phoenix Elec. Corp., supra, 62 Cal.2d 40, 48, 41 Cal.Rptr. 73, 396 P.2d 377, our Supreme Court observed that what was really going on was the general's insurer was trying to transfer liability to a sub and its insurer, though the insurers weren't (nominally) in the case. (See also Herrick Corp. v. Canadian Ins. Co. (1994) 29 Cal.App.4th 753, 756, 34 Cal.Rptr.2d 844 ["We suspect there is much that lies beneath the surface of the record."].) There may be something of this in the present case, where the developer's own CGL insurer is ostensibly not before us. In the usual case, i.e., where the developer or general sought insurance coverage from the sub's insurer pursuant to an additional insured endorsement, the result would likely be an equal division of the misery (defense costs) between the general's and the sub's (or subs') insurers. For example, in Maryland Casualty Co. v. Nationwide Mutual Ins. Co. (2000) 81 Cal.App.4th 1082, 1090-1091, 97 Cal.Rptr.2d 374 (Maryland v. Nationwide II), the trial court had saddled the subcontractors' insurer with all the general's defense costs on the theory that a typewritten addition on one of the two subcontractor's policies adding the general as an additional insured made the subcontractor's insurer primary over any other policy. The appellate court ultimately rejected that theory, sending the case back for an equitable allocation of the general's defense costs. The court pointed out that it would not be reasonable to have the subcontractor's insurer bear all the general's defense costs, particularly in light of language trying to carefully limit the scope of the additional insured coverage. (See id. at p. 1090, 97 Cal.Rptr.2d 374.)

Contrast Maryland v. Nationwide II with what appears to be happening in this case. By not making a claim under the sub's insurer's additional endorsement, but claiming directly on the sub's independent contractual indemnity obligation, the result is that the developer's insurer doesn't pay any defense fees. Those defense costs, at least so far as this present appeal is concerned, will all be borne by the subcontractors, or, more likely, the subcontractors' insurers. (Remember that these agreements presuppose that the subcontractor already has insurance.) Whether such a result is the end of the line, however, is a matter which we need not address. We may leave for another day the prospect of, say, a contribution action by the subs' insurers against the developer's insurer on the theory that they paid a portion of defense costs for which the developer's insurer should have been rightly responsible. We only raise the possibility, though, to illustrate that the gambit of requesting a defense only from the sub itself and not from the sub's insurer under an additional insured endorsement might not work. If the next phase were indeed a successful contribution action between insurers, then things would have come full circle back to the equitable allocation model exemplified in Maryland v. Nationwide II, with the developer's insurer still on the hook for its portion of defense costs.
[21] In MacDonald & Kruse, Inc. v. San Jose Steel Co. (1972) 29 Cal.App.3d 413, 419-420, 105 Cal.Rptr. 725, the court developed a typology of indemnity agreements (types I, II, and III) focusing on the degree to which the indemnitor agreed to pay for the indemnitee's negligence (unequivocal including the indemnitee's own negligence, passive negligence but not active negligence, or liabilities caused by the indemnitor only). However, the clear weight of appellate case authority has "eschewed a `mechanical application'" of MacDonald & Kruse typology in favor of looking at the precise text of the actual contract. (See Heppler, supra, 73 Cal.App.4th at p. 1276, 87 Cal.Rptr.2d 497; see also Herman Christensen & Sons, Inc. v. Paris Plastering Co. (1976) 61 Cal.App.3d 237, 249, 132 Cal.Rptr. 86 [criticizing MacDonald & Kruse for applying Goldman where it didn't fit]; Rodriguez v. McDonnell Douglas Corp. (1978) 87 Cal.App.3d 626, 674, 151 Cal.Rptr. 399 ["We hold that the MacDonald & Kruse classification is no longer tenable in light of Rossmoor"]; Maryland Casualty Co. v. Bailey & Sons, Inc. (1995) 35 Cal.App.4th 856, 868, 41 Cal.Rptr.2d 519 ["`the foundation of the holding in MacDonald & Kruse, Inc. appears substantially undercut by the subsequently evolving and presumably more equitable trend in statutory and case law toward allocating liability in proportion to comparative fault'"]; Hernandez v. Badger Construction Equipment Co. (1994) 28 Cal.App.4th 1791, 1823, 34 Cal.Rptr.2d 732 [source of quotation from Bailey above].) The departure from MacDonald & Kruse's arbitrary typology is soundly rooted in Supreme Court jurisprudence, as the quoted language from Rossmoor Sanitation shows. (See also Heppler, supra, 73 Cal.App.4th at p. 1277, 87 Cal.Rptr.2d 497 [also quoting Rossmoor for same proposition].)
[22] The indemnity agreement in Morton Thiokol obviously contemplated payment of the indemnitee's attorney fees incurred in the defense of an underlying action, but also equally obviously pegged such payment to a trigger of breach of contract or failure to exercise due care: There, the indemnitor Contractor promised "to indemnify and hold harmless the Owner and its agents and employees from any and all liabilities, loss, damage, cost and expense (including attorney fees) sustained by reason of Contractor's breach of warranty, breach of contract, misrepresentation or false certification, or failure to exercise due care. All indemnifications shall be continuing." (Morton Thiokol, supra, 193 Cal.App.3d at p. 1027, 238 Cal.Rptr. 722, our italics.) Readers should note the absence of the word "defend" in the agreement despite the contemplation that, under certain circumstances, the Contractor will be obligated to pay the indemnitee's attorney fees.
[23] The case before us is contractual. The primary question is, what does the subcontract mean when the subcontractor promises "to indemnify" and "to defend" a class of lawsuits? As such, we are not concerned with situations where the trigger of a defense obligation is statutorily defined or governed. For example, in the context of an employer's statutory duty to indemnify an employee for all expenses incurred in "direct consequence" of the employee's duties (Lab.Code, § 2802), it may very well be the case that retroactively-determined reimbursement is the correct model. (See Douglas v. Los Angeles Herald-Examiner (1975) 50 Cal.App.3d 449, 464, 123 Cal.Rptr. 683 [contrasting employer's defense obligation and trigger as set out in Labor Code section 2802 with Gray's potentiality trigger, because "if the statutorily defined state of facts does not exist then the statutory rights do not arise"]; Jacobus v. Krambo Corp. (2000) 78 Cal.App.4th 1096, 1100, 93 Cal.Rptr.2d 425 [citing Douglas for the idea that "Unlike an insurer, the employer need not defend whenever there is a mere potential for liability"]; see also Boyer v. Jensen (2005) 129 Cal.App.4th 62, 73, 28 Cal.Rptr.3d 124 [in rejecting an argument based on an analogy to section 2802, noting "significant differences between an insurer and an employer/indemnitor"].)

In this regard, section 2778, subdivision (3) of the Civil Code  which is quoted and discussed in much more detail in part IV.D.1 below (discussing the public policy that governs the area), can arguably be read to place defense within indemnity in cases where no "contrary intention" appears. Here, however, as we have shown, a contrary intention certainly does appear, in the form of specific language creating a duty to defense independent of a duty to pay a judgment or settlement. Moreover, as we show in detail in part IV.D.1, section 2887, subdivision (3) is not only compatible with a separate defense obligation, but, when the statutory scheme of which it is a part is read as a whole, a separate defense obligation is its most natural implication.
[24] Indeed, it is the express use of the word "defend" in the contract where we join issue with the dissent. Our approach is to begin with the contractual language (see Rossmoor Sanitation Inc. v. Pylon, Inc. supra, 13 Cal.3d at p. 633, 119 Cal.Rptr. 449, 532 P.2d 97 ["it is the intent of the parties as expressed in the agreement that should control"]) and then see if there is a public policy, expressed in a statute, that would preclude or otherwise vary what the ordinary meaning of the contractual language mandates. (Hence we devote part IV.D. of this opinion to examining whether some public policy requires a different result than the one expressed in the contract.) The dissent, by contrast, reasons from what it considers a socially desirable outcome to spin the language of the contract in that direction, overlooking the fact that the obligation to defend is expressly made a different one from the obligation to indemnify.
[25] "All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against public policy."
[26] The Centex court buttressed its conclusion by noting that the "commercial setting" was a single commercial building, as distinct from a "large residential tract" which would be marketed to "unknown" consumers and where a general contractor would have a "unique ability to pass on the cost of defects to its customers and a unique liability to them." (Centex, supra, 78 Cal.App.4th at p. 998, 93 Cal.Rptr.2d 259.) It would then say in the next paragraph that "unlike the mass producer of homes, it [the general] had no ability to pass the costs of its defects on to other customers and thus no liability in tort different from the liability of its subcontractors." (Id. at pp. 998-999, 93 Cal.Rptr.2d 259.)

As we explain in greater detail in part IV.D.3. of this opinion dealing with conscionability, we believe that the decision in the case before us is also, like Centex, consistent with the "commercial context" of its origins, and ironically now, with the overruling of La Jolla Village Homeowners' Assn. v. Superior Court, supra, 212 Cal.App.3d 1131, 261 Cal.Rptr. 146, even more so. In Centex's reference to a general contractor's "unique liability" to consumers in the context of mass produced homes, and the subsequent reference to passing on costs of defects where it had "no liability in tort different from the liability of its subcontractors" one may postulate an allusion to the La Jolla Village Homeowners' case, which itself had voiced an antipathy to subcontractor strict liability on the theory that they could not "spread the cost of a plaintiff's typically economic damages." (See La Jolla Village Homeowners' Assn., supra, 212 Cal.App.3d at p. 1144, 261 Cal.Rptr. 146.) And, while the Centex court did not refer to La Jolla Village Homeowners' Assn., it did cite a page in Heppler that strongly relied on La Jolla Village Homeowners' Assn. (Compare Centex, supra, 78 Cal.App.4th at p. 998, 93 Cal.Rptr.2d 259, citing Heppler, supra, 73 Cal.App.4th at p. 1279, 87 Cal.Rptr.2d 497 with Heppler, supra, 73 Cal.App.4th at p. 1279, 87 Cal.Rptr.2d 497, citing and discussing La Jolla Village Homeowners' Assn., supra, 212 Cal.App.3d at pp. 1145-1146, 261 Cal.Rptr. 146.)
[27] The core of the dissent is the following analysis of the second clause of section 12: "The qualifying phrase, `claim of such damage' clearly refers to the earlier language limiting the scope of claims embraced by the indemnity, i.e., `all claims for damages ... growing out of the execution of the work.' Therefore, both obligations appear to be dependent on the same coverage terms." The flaw in the dissent's analysis is its failure to acknowledge the inherent difference between a duty to indemnify and a duty to defend. As discussed in Section IV.A. above, the duty to defend, unlike a duty to indemnify, is a current duty. This point is made clear in Civil Code section 2778, which sets forth general rules of construction for indemnity agreements, absent an apparent intent to the contrary. For example, section 2778, subdivision (2) provides that a contractual duty to indemnify "against claims, or demands, or damages, or costs" is triggered by the indemnitee's payment. The duty to defend, on the other hand, is triggered "on request of the person indemnified." (§ 2778, subd. (4).) Had the parties intended defense costs to be paid only after a determination of liability, they could have employed the word "reimburse" instead of "defend," as did the parties in M. Perez Co. Inc. v. Base Camp Condominiums Assn. No. One, supra, 111 Cal.App.4th 456, 463, 3 Cal.Rptr.3d 563.
[28] Here is the entirety of the exemplar indemnity and defense clause as set forth by the court in Regan Roofing: "Indemnity-Subcontractor shall at all times indemnify and hold Contractor harmless as follows: [¶] (i) Subcontractor shall indemnify and hold harmless Contractor against all liability for claims or liens for labor performed, or materials used or furnished to be used on the job by or through Subcontractor; [¶] (ii) Subcontractor shall indemnify and hold harmless Contractor against any other liability, cost or expense of any nature or kind arising out of or in any way connected with Subcontractor's performance of this Subcontract, save and except only such liability, cost or expense caused by Contractor's sole negligence or sole willful misconduct. [¶] Pursuant to each of the foregoing, Subcontractor shall indemnify and hold harmless Contractor from any costs and expenses for attorney's fees and all incidental and consequential damages resulting to Contractor from such claims or liens. In the event any suit on any claim is brought against Contractor, subject to the provision, Subcontractor shall defend said suit at Subcontractor's own cost and expense and will pay and satisfy any such lien or judgment as may be established by the decision of the Court in such suit...." (Regan Roofing, supra, 24 Cal.App.4th at p. 430, 29 Cal.Rptr.2d 413.)
[29] Consider these three passages: (1) "Regan Roofing has raised a number of interesting substantive questions concerning the scope of a duty to defend arising from a contractual indemnification clause, as opposed to a contract of insurance, and has additionally argued that the trial court incorrectly construed the subject indemnity provision as providing specific indemnification"; (2) "We decline to reach these substantive arguments, as this petition for writ of mandate is properly disposed of on the procedural grounds asserted"; and (3) "We shall discuss the substantive issues raised only within the context of deciding whether they were, as the trial court ruled, proper subjects of summary adjudication at all." (Regan Roofing, supra, 24 Cal.App.4th at pp. 429, 432-433, 29 Cal.Rptr.2d 413.)
[30] The most telling passage we can offer as to the nature of the court's procedural point is this one: "With this theoretical background in mind [basically, several general points on the nature of summary adjudication, see Regan Roofing, supra, 24 Cal.App.4th at p. 435, 29 Cal.Rptr.2d 413], we first discuss whether the trial court properly summarily adjudicated that there was a duty to defend in this contractual indemnity context, where a broad scope of relief (more than just declaratory relief) is sought. We then address the portion of the ruling defining the type of indemnity provision from which any alleged duties arose (i.e., specific indemnity). As to both topics, we reiterate that although Pacific Scene's [the developer's] cross-complaint evidently seeks declaratory relief, it also seeks damages and other relief regarding the contractual indemnity provision and related theories." (Regan Roofing, supra, 24 Cal.App.4th at p. 435, 29 Cal.Rptr.2d 413.)
[31] As it turns out, the purely "procedural" aspects of Regan Roofing have also not withstood critical scrutiny. In Transamerica Ins. Co. v. Superior Court (1994) 29 Cal.App.4th 1705, 1712-1713, 35 Cal.Rptr.2d 259, the court recognized that Regan Roofing's per se rule precluding summary adjudication of a contractual duty if the summary adjudication did not also dispose of a cause of action or defense could not stand up under the mass of precedent allowing summary adjudication of insurers' alleged contractual duties to defend.
[32] Indeed, we recognize that the form indemnity provision at issue in Heppler is identical to the one before us today. As we will now show, however, the Heppler court never discussed the language in that provision specifically creating a defense obligation separate from the obligation to make good any settlement or judgment (what we have called "classic indemnity"). Rather, the Heppler court proceeded on the assumption that any defense obligation was subsumed within the rules of classic indemnity. Because the court never considered the obligation created by the specific "defense" language in the agreement, we have a virtual textbook example of where a case is not authority for a proposition because it never considered that proposition, or its converse.
[33] This settlement of the class action followed the pattern of an earlier settlement with the homeowners' association. (See Heppler, supra, 73 Cal.App.4th at p. 1273, fn. 5, 87 Cal.Rptr.2d 497.)
[34] All ellipses in this quotation are from the original: "Torres and Signs signed identical preprinted subcontracts supplied by one of the master developers (see fn. 1, ante [the footnote lists other developers in the project]), which contained indemnity language providing the subcontractors would defend and indemnify Peters for `... damage to property arising out of or in connection with Subcontractor's ... performance of the Work and for any breach or default of the Subcontractor in the performance of its obligations under this Agreement.' Paragraph 1 of the general conditions of these subcontracts defines the terms used in the contract and provides, `The use of the word "work" is intended to include the materials furnished, as well as the labor required under this Agreement.' [¶] Martin and Mueller signed identical subcontracts on preprinted forms supplied by Peters, which contained language that the subcontractor `agree[s] to indemnify and save [Peters] harmless against all claims for damages to persons or to property growing out of the execution of the work, and at his own expense to defend any suit or action brought against [Peters] founded upon the claim of such damage....' These fully integrated subcontracts also contained provisions requiring the subcontractors to adhere to a nonnegligent standard of care in the performance of their work." (Heppler, supra, 73 Cal.App.4th at pp. 1277-1278, 87 Cal.Rptr.2d 497.)
[35] Here is the passage: "Plaintiffs' contention that language found in these contracts is sufficient to trigger indemnity obligations regardless of the indemnitor's fault also runs afoul of public policy considerations and decisional law, which impose vastly different responsibility on a developer versus a subcontractor. In a case such as this, plaintiffs' position would have the effect of transferring [the developer's] strict liability as a developer to the subcontractors, without the use of specific contractual language that unambiguously manifested this intent. However, the law makes a distinction between the liabilities of a housing developer and those of a subcontractor for defects in construction; namely, the developer is strictly liable and the subcontractor is not. (La Jolla Village Homeowners' Assn. v. Superior Court (1989) 212 Cal.App.3d 1131, 1143-1145, 261 Cal.Rptr. 146.) Residential developers are held strictly liable because of a recognition they are the best positioned to bear the costs associated with construction defects and the best positioned to monitor and coordinate construction from start to finish. Developers `usually [are] the best capitalized and most likely insured of the various entities involved in home construction.' (Id. at p. 1145, 261 Cal.Rptr. 146.)" (Heppler, supra, 73 Cal.App.4th at pp. 1278-1279, 87 Cal.Rptr.2d 497.)
[36] Here is the one sentence: "Here, the indemnity provisions of the subcontracts do not contain the `"shall apply to any acts or omissions, willful misconduct or negligent conduct, whether active or passive, on the part of Subcontractor"' (53 Cal.App.4th at p. 505, 61 Cal.Rptr.2d 668, italics omitted) language or any similar language that specifies the indemnitor's conduct or fault is of no consequence in determining whether the indemnity obligation is triggered." (Heppler, supra, 73 Cal.App.4th at p. 1280, 87 Cal.Rptr.2d 497, original italics.)
[37] By the way, despite the fact that La Jolla Village Homeowners' Assn. is now overruled, the economic disparity between subs and developers is not a theme with which we are unsympathetic. We deal with the topic again in part IV.D.3. of this opinion on conscionability.
[38] "Contrary to plaintiffs' contentions, these subcontractors, who promised to indemnify [the developer] against damages caused by their negligent work, did not assume the role of liability insurers. Liability insurers protect insureds against damage or liability from generally defined risks in exchange for a premium. (Herrick Corp. v. Canadian Ins. Co., [1994] 29 Cal.App.4th 753, 763, 34 Cal.Rptr.2d 844.) Insurers have a distinct and free-standing duty to defend their insureds (Gray v. Zurich Insurance Co. (1966) 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168) as opposed to indemnitors, whose duty to defend is not triggered until it is determined that the proceeding against the indemnitee is "embraced by the indemnity." (Civ.Code, § 2778, subd. 4; see also Regan Roofing Co. v. Superior Court, supra, 24 Cal.App.4th 425, 436-437, 29 Cal.Rptr.2d 413 [duty to defend stemming from insurance policy is broader in part because it is an adhesion contract.].) Plaintiffs' reliance on a line of insurance coverage cases (e.g., Isaacson v. California Ins. Guarantee Assn. (1988) 44 Cal.3d 775, 244 Cal.Rptr. 655, 750 P.2d 297) is misplaced." (Heppler, supra, 73 Cal.App.4th at p. 1282, 87 Cal.Rptr.2d 497.)
[39] "Peters tendered its defense in the underlying lawsuit to Martin, which rejected the tender. Under the subcontract with Martin, Peters was entitled to indemnity for its losses, including attorney fees and costs, in defending and settling the claims against it. Civil Code section 2778, subdivision 3 provides that unless a contrary intention appears `[a]n indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion[.]' By virtue of Peters's assignment, plaintiffs were properly awarded Peters's attorney fees and costs up to the time of the assignment as an item of damages for Martin's breach of its indemnity obligation." (Heppler, supra, 73 Cal.App.4th at p. 1293, 87 Cal.Rptr.2d 497.)
[40] With due respect to our dissenting colleague, it is simply incorrect to say that we express "disapproval" of Heppler, or ignore its precedential value, or refuse to "follow it." We have taken, in that regard, great care  practically going paragraph by paragraph  to explain precisely where the "precedential value" of the case begins and where it ends. Our disagreement is not with Heppler, but with our dissenting colleague's interpretation that Heppler established a per se rule. It did not. As we have shown, Heppler never directly confronted the issue before us, let alone established a per se rule.
[41] We have attempted in this opinion, by relentlessly emphasizing the narrowness of the circumstances that may trigger the indemnitor's defense obligation, to bridge the gap we have with the dissent. Alas, we can only say again that the dissent exaggerates when it fears that recognizing a duty to defend, clearly spelled out in a contract, will make it "likely subcontractors will be forced to provide a current defense for claims that are only potentially covered." (at p. 844.) Not so. This contract is not an insurance contract. It only obligates the indemnitor to defend "suit or action ... founded upon the claim of such damage" (i.e., damage growing out of the indemnitor's own work). (Italics added.) We note that the dissent never comes to grips with the fact that "the claim of such damage" is not synonymous with the potentiality rule in insurance law. And, for what it is worth, let us say yet again that we do not import the potentiality rule from insurance law into this contract. We merely affirm the trial court's common sense finding that the underlying suit in this case was indeed "founded upon the claim of such damage" meaning a claim for damages "growing out of the execution" of the window manufacturer's work.
[42] In pertinent part the contract provided, "... Subcontractor shall, on request of [the developer] ... but at Subcontractor's own expense, defend any suit asserting a claim covered by this indemnity." (Baldwin Builders, supra, 125 Cal.App.4th at p. 1342, 24 Cal.Rptr.3d 9.)
[43] Here is the entire text of the section: "Except as provided in Sections 2782.1, 2782.2, 2782.5, and 2782.6, provisions, clauses, covenants, or agreements contained in, collateral to, or affecting any construction contract and which purport to indemnify the promisee against liability for damages for death or bodily injury to persons, injury to property, or any other loss, damage or expense arising from the sole negligence or willful misconduct of the promisee or the promisee's agents, servants or independent contractors who are directly responsible to such promisee, or for defects in design furnished by such persons, are against public policy and are void and unenforceable; provided, however, that this provision shall not affect the validity of any insurance contract, workers' compensation or agreement issued by an admitted insurer as defined by the Insurance Code."
[44] It may be that some of the cases have been subtextually influenced by the idea that you cannot know that the indemnitee (i.e., promisee, or developer) is seeking indemnification for its sole negligence unless you first determine that the indemnitor (i.e., promisor, or subcontractor) is partly at fault (i.e., a requisite negligence finding). But such a reading is untenable. It means that there could never be a duty to defend in the indemnity context, because the issue of the sole negligence of the promisee would never be adjudicated until after the need for a defense would have passed  we would be back to the chicken-egg indemnity conundrum addressed in Gray, but resolved exactly and always in the opposite direction. Moreover, as we are about to show, the Legislature itself has provided for defense obligations to be undertaken by indemnitors, which is a result inconsistent with any "wait-until-it's-finally-over-and-all-negligence-issues-have-been-decided" reading of section 2778.
[45] Our dissenting colleague posits that our decision today "will burden[] the trial courts with complicated pre-trial issues." We hope not  and it must be admitted that this trial court was certainly not so burdened; it had no problem skillfully sorting out who owed what to whom, and when. In any event, courts cannot construe contracts from what they otherwise might say merely out of a concern that trial courts might be "burdened." They don't, for example, stop hearing multi-party insurance litigation involving multiple insurers and even multi-level policies just because such litigation presents practical problems of administration, as shown by the Aerojet-General Corp. v. Transport Indemnity Co. case.
[46] $46,734 to be exact.
[47] The fee clause was written in terms of the window manufacturer's obligation to pay the developer, but, of course, under section 1717, subdivision (a), it would have meant that the developer would have had to pay the window manufacturer if it had been the prevailing party. No issue is raised in this appeal about the scope of the fee clause; rather this is a challenge to the trial court's finding that the developer was the prevailing party on its cross-complaint.
[48] In both cases the contract involved reciprocal fee provisions, a fact which raised the threshold problem of whether section 1717 even applied, a point on which the courts in each case split. (Cf. Santisas, supra, 17 Cal.4th at pp. 626-627, 71 Cal.Rptr.2d 830, 951 P.2d 399 (conc. & dis. opn. of Baxter, J.) ["prevailing parties subject to bilateral fee agreements may now proceed under Code of Civil Procedure sections 1032 and 1033.5 to recover their contractual fees as costs, section 1717 remains vital for purposes of assuring mutuality of remedy for parties litigating under one-sided fee agreements"]; Sears, supra, 60 Cal.App.4th at p. 1160, 70 Cal.Rptr.2d 769 (conc. & dis. opn. of Kline, P.J.) ["Since the contract in this case contains a reciprocal fee provision, the statute has no application."].)
[1] All further statutory references are to the Civil Code.
[2] Section 2778, subdivisions 5 and 6, apply only after the obligation to defend has been triggered.
[3] The Supreme Court in Buss warned, "Read in context, language in certain decisions stating or implying that the duty to defend is `independent' of the duty to indemnify (e.g., Gray v. Zurich Insurance Co. [(1966)] 65 Cal.2d [263, 274, 54 Cal.Rptr. 104, 419 P.2d 168;] ... Financial Indem. Co. v. Colonial Ins. Co. [1955] 132 Cal.App.2d [207, 211, 281 P.2d 883] ...) means nothing more than that the former is broader than the latter. Both the duty to indemnify and the duty to defend are in fact dependent on coverage  the former on actual coverage, the latter on at least potential coverage." (Buss, supra, 16 Cal.4th at p. 47, fn. 10, 65 Cal.Rptr.2d 366, 939 P.2d 766.)
[4] The majority correctly notes the "decisional authority" referred to by the Heppler court in this sentence was later overruled by the Supreme Court in Jimenez v. Superior Court (2002) 29 Cal.4th 473, 127 Cal.Rptr.2d 614, 58 P.3d 450 [subcontractor manufacturers can now be subject to strict liability like housing developers].) (ante, at pp. 822-823, 828.) However, this change in tort law has not altered the public policy considerations that are based on the realities of the construction industry. As acknowledged by the majority, subcontractors who agree to indemnify developers do not necessarily assume the role of liability insurers. (See ante, at pp. 804-805.) To the extent the developer still typically occupies the better bargaining position, and is not paying premiums for the right to expect broad protection, the language must be strictly construed against the indemnitee.
[5] I am also uneasy with the majority's clear pronouncement the subject of indemnity is "inherently dull." (See e.g., ante, at p. 791, fn. 4.) "Everyone thinks that all the bells echo his own thoughts." (German Proverb.)
[6] I note, Regan Roofing is another case that supports my interpretation of section 2778, subdivision (4), and the indemnity provision. That court determined the developer's motion was premature based on its finding, (1) the subcontractors had not yet been found "negligent in the performance of their work, giving rise to a duty to indemnify and a related duty to defend[,]" and (2) there was no evidence suggesting the duty to defend claims of liability was "entirely free-standing of the duty to indemnify for liability arising out of the subcontractor's negligence. ( ... 2778, subd. 4.)" (Regan Roofing, supra, 24 Cal.App.4th at p. 436, 29 Cal.Rptr.2d 413, italics added.) In other words, in order to trump section 2778's declaration the duties are related, the parties would have to have expressed a contrary intent in the contract or be able to produce evidence proving the obligations were intended to be independent.